IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

| | | |
|---|---|---|
| BARBARA MARTINEZ, individually and as next friend and guardian of D.B., | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 1:17-CV-00102-BU |
| JOEL DEREK ROJO, individually, and the CITY OF BIG SPRING, TEXAS, | § § § § | |
| Defendants. | § § | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Barbara Martinez ("Martinez"), individually and as next friend and guardian of D.B., brought this civil rights action under 42 U.S.C. §§ 1983 and 1988 against Joel Rojo ("Rojo"), in his individual capacity, and the City of Big Spring ("the City"). The City filed a motion for summary judgment.[1] *See* Dkt. No. 29. Martinez filed a response opposing the motion. *See* Dkt. No. 38. And the City filed a reply. *See* Dkt. No. 41.

For the following reasons, the City's motion is GRANTED.

## I.   BACKGROUND

In early June 2015, Rojo was a detective with the Big Spring Police Department ("BSPD") when he sexually assaulted a twelve-year-old female ("D.B."), on three separate occasions.[2] Dkt. No. 1-3 at 4; Dkt. No. 30 at 8. Under the pretext of investigating juveniles for trespass and burglary, Rojo had D.B. remove her clothing and took photos of her exposed breasts on two

---

[1] The Court uses the terms "City" and "BSPD" interchangeably unless the context indicates otherwise.
[2] While there is no evidence regarding the exact number of police officers in the BSPD at the time, the record reveals that it had up to forty-eight officers, with five of those — including Rojo — serving as detectives. Dkt No. 31-5 at 8–9.

1

occasions in his office at the BSPD station, as well as taking fully nude photos while in his police vehicle at a secluded location.  Dkt. No. 30 at 8; Dkt. No. 1-3 at 4; Dkt. No. 39 at 14.

Two months after these assaults, on August 20, 2015, BSPD Chief Chad Williams ("Chief Williams") and BSPD Administrative Lieutenant Brian Gordon ("Lieutenant Gordon") received a phone call from the Howard County Sheriff informing them of allegations of sexual misconduct made against Rojo by another minor female, identified as "C.A.K."  Dkt. No. 30 at 16.  The next day, Chief Williams placed Rojo on administrative leave when he reported for work, initiated an Internal Affairs ("IA") investigation, and referred the matter to the Texas Rangers for a criminal investigation.[3]  Id. at 9.

While these investigations were pending, Martinez, D.B.'s mother, discovered that her daughter had also been sexually assaulted by Rojo and reported this to the BSPD on October 9, 2015.  Id.; Dkt. No. 1-3 at 5.

Ultimately, a grand jury indicted Rojo on multiple charges related to his sexual assaults of C.A.K. and D.B.[4]  Dkt. No. 30 at 9.

 After Rojo's indictment, a third minor ("S.R.B.") accused Rojo of sexual assault which occurred in April 2015.  Id. at 9, 14–15.  Following a jury trial in 2017, Rojo was found guilty and sentenced to twenty years in prison.[5]  Id.

Martinez filed this lawsuit on June 5, 2017.  See Dkt. No. 1-3.  Her original complaint was filed in the 118th Judicial District of Howard County, Texas, and the City removed the case to federal court on June 30, 2017.  Id.; Dkt. Nos. 1 and 3.  The parties consented to the exercise of

---

[3] Rojo was never returned to active duty and was terminated on June 17, 2016.
[4] The grand jury indicted Rojo on charges of Official Oppression, Sexual Performance by a Child, Indecency with a Child by Sexual Exposure, Attempt to Commit Indecency with a Child by Exposure, and Indecency of a Child by Sexual Contact.
[5] With respect to Rojo's illegal contact with D.B., he was convicted of Indecency with a Child by Sexual Exposure and Sexual Performance of a Child.  See Dkt. No. 30 at 9, n. 2.

jurisdiction by a United States magistrate judge in their proposed scheduling order filed on September 1, 2017.  Dkt. No. 11.

## II.    SUBJECT MATTER JURISDICTION

"Federal courts are courts of limited jurisdiction, and absent jurisdiction conferred by statute, lack the power to adjudicate claims."  *Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 151 (5th Cir. 1998).  The court "must presume that a suit lies outside this limited jurisdiction, and the burden of establishing federal jurisdiction rests on the party seeking the federal forum." *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001).  Indeed, "before a federal court can consider the merits of a legal claim, the person seeking to invoke the jurisdiction of the court must establish the requisite standing to sue."  *Whitmore v. Arkansas*, 495 U.S. 149, 154 (1990).

Martinez seeks to bring claims on behalf of herself and her minor daughter, D.B., under 42 U.S.C. §§ 1983 and 1988.  Though not an issue raised by the parties, the Court must address, as a threshold matter, whether Martinez has standing to bring individual claims against the City and Rojo under § 1983.

In order to establish standing under Article III of the United States Constitution with respect to her individual claims, Martinez must demonstrate that she has "suffered 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision."  *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).  "The injury must affect the plaintiff in a personal and individual way."  *Lujan*, 504 U.S. at 560, n. 1.

Under § 1983, Martinez has standing in her individual capacity if she "clearly allege[s] an injury to [her] own personal constitutional rights."  *Hooker v. Dallas Indep. Sch. Dist.*, 3:09-CV-1289-D, 2010 WL 4025877, at *5 (N.D. Tex. Oct. 13, 2010) (quoting *Trujillo v. Bd. of Cnty.*

3

*Commis. of Santa Fe Cnty.*, 768 F.2d 1186, 1187 (10th Cir. 1985)).  "It is well-established that parents lack standing to bring individual claims under § 1983 based solely upon deprivation of a child's constitutional rights." *Crozier v. Westside Cmty. Sch. Dist.*, No. 8:18CV438, 2018 WL 5298744, at *2 (D. Neb. Oct. 25, 2018) (citations omitted).

The Supreme Court has recognized that parental rights are a protected liberty interest under the Fourteenth Amendment. *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000) (discussing "extensive precedent").  However, the case law governing parental liberty rights is narrow and primarily addresses parental rights with respect to child-rearing decisions concerning the care, custody, and control of minors. *Id*.

In contrast, Martinez alleges individual capacity pecuniary claims of lost income, past and future medical expenses, and expenses associated with moving herself and D.B. out of the state as a result of Rojo's sexual assault of her daughter. Dkt. No. 1-3 at 15–16.  She further alleges non-pecuniary claims that "the sexual assault" by Rojo "interfered with the mother-daughter relationship" between Martinez and D.B., "causing pain and behavioral changes for D.B., and causing pain for Ms. Martinez." *Id.* at 15.

While such claims may be recoverable under a state law tort theory, they do not implicate a constitutional right and, therefore, are not cognizable under § 1983 as a violation of Martinez's own constitutional rights.  *See T.F.R. v. Morris Cnty. Prosecutor's Office*, No. 2:16-5407, 2017 WL 4390098, at *4 (D. N.J. Oct. 3, 2017) (dismissing parents' individual claims under § 1983 for lack of standing where parents suffered loss of income and emotional injuries that stemmed from alleged constitutional violations during their son's arrest and prosecution).

With respect to Martinez's  non-pecuniary claim that  her "right to recover damages for obligations and harms caused are protected by the [Fourteenth Amendment], which protects

parental rights created by special bonds with their children," Martinez's passing reference to a Fourteenth Amendment interest fails to articulate the type of injury caselaw recognizes as a violation of a parent's own constitutional rights. Dkt. No. 1-3 at 17. Martinez does not claim that the actions of the City or Rojo deliberately undermined her right as a parent to make critical decisions about the care, custody, and control of her child.[6] Rather, she claims that Rojo and the City caused her child harm, and as a result, Martinez was deprived of her constitutional rights.

Martinez's non-pecuniary claim is akin to emotional distress, which again is not a constitutionally protected interest cognizable under § 1983. *See Burrow v. Postville Cmty. Sch. Dist.*, 929 F. Supp. 1193, 1208 (N.D. Iowa 1996) (holding that parents could not bring a § 1983 action against the school based on their own claims of emotional distress); *Morgan v. City of New York*, 166 F. Supp. 2d 817, 819 (S.D.N.Y. 2001) (holding that a mother lacked standing to bring individual claims under § 1983 based on a deprivation of [her child's] constitutional rights). And, to the extent that Martinez's non-pecuniary claim can be characterized as a loss of filial consortium claim under state law, Texas law "does not authorize a parent to recover consortium damages for non-fatal injuries to a child, whether due to negligent or intentional conduct." *Moreno v. McAllen Indep. Sch. Dist.*, No. 7:15-CV-162, 2016 WL 1258410, *8 (S.D. Tex. March 31, 2016) (citing *Roberts v. Williamson*, 111 S.W.3d 113, 120 (Tex. 2003) ("We conclude that no compelling social policy impels us to recognize a parent's right to damages for the loss of filial consortium.")).

Ultimately, the Court concludes that Martinez lacks standing to bring individual claims under § 1983 in this action, which deprives the Court of the subject matter jurisdiction to adjudicate

---

[6] *See Malagon de Fuentes v. Gonzales*, 462 F.3d 498, 505 (5th Cir. 2006) ("[T]he Supreme Court has protected the parent only when the government *directly* acts to sever or otherwise affect his or her legal relationship with a child. The Court has never held that governmental action that affects the parental relationship only incidentally . . . is susceptible to challenge for a violation of due process") (quoting *McCurdy v. Dodd,* 352 F.3d 820, 827 (3d Cir. 2003) (citations omitted) (emphasis added)).

Martinez's claims on behalf of herself. The Court, however, maintains subject matter jurisdiction over the § 1983 claims Martinez brings in her representative capacity on behalf of her minor daughter as next friend and guardian. *See* Fed. R. Civ. P. 17(c)(1)–(2). In that capacity, Martinez is hereinafter referred to as "Plaintiff."

### III.    STATUS OF DISCOVERY

In a joint motion to amend the scheduling order filed on February 15, 2019 (Dkt. No. 27), Plaintiff and the City represented that they had "diligently proceeded in discovery" and had "cooperatively resolved all matters to date." *Id*. at 3. Plaintiff and the City further indicated that any additional discovery that might be needed related only to issues other than liability and that their discovery up to that point had been focused solely on the issue of liability. *Id.* Plaintiff and the City also affirmatively represented that they were not seeking to extend the dispositive motion deadline. *Id.* In that same joint motion, the parties sought a deadline for such additional discovery, if necessary, of sixty (60) days following the Court's ruling on the City's motion for summary judgment. *Id.* at 4.

The Court denied the request by Plaintiff and the City to keep the discovery deadline open until after the Court's ruling on the City's motion for summary judgment and instead solicited the parties' input on a proposed discovery schedule. Dkt. No. 28. At the parties' requests, the Court held a status conference on March 15, 2019, after which the Court set a deadline for all discovery of August 30, 2019 (Dkt. No. 37). Prior to the expiration of that discovery deadline, on August 28, 2019, Plaintiff and the City filed another joint motion to amend the scheduling order for the sixth time, again seeking to abate the discovery deadline until after the Court ruled on the City's motion for summary judgment, and again representing that they had "diligently proceeded in discovery and cooperatively resolved all matters to date." *See* Dkt. No. 43 at 1.

The Court held another status conference on January 14, 2020, after which it granted the Plaintiff and the City's request to stay the deadline for additional discovery, if needed, until after the Court ruled on the City's motion for summary judgment. Dkt. No. 50.  However, in that status conference Plaintiff and the City echoed their previous representations that they had "worked together to identify all discovery deemed necessary to determine the issue of liability," had not engaged in discovery "directed at any other issue," and, in particular, that the depositions of Plaintiff, Rojo, and the parties' experts were not needed or warranted until after the Court's ruling on summary judgment.  Dkt.  No. 27.

Based on these representations, and in the absence of a request for relief under Rule 56(d) of the Federal Rules of Civil Procedure, the Court finds, notwithstanding the absence of the depositions noted above or any additional discovery that might have been conducted, that Plaintiff and the City were able to fully develop the summary judgment record on the issue of liability.  The Court further notes that neither Plaintiff nor the City objected to the materials cited in the other's summary judgment briefs.

## IV.    SUMMARY JUDGMENT STANDARD

When the record establishes "that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law," summary judgment is appropriate.  Fed. R. Civ. P. 56(a).  "[A dispute] is 'genuine' if it is real and substantial, as opposed to merely formal, pretended, or a sham."  *Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001) (citation omitted).  A "material" fact is one that "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The City, as the movant, "bears the initial burden of identifying those portions of the pleadings and discovery in the record that it believes demonstrate the absence of a genuine issue

of material fact, but is not required to negate elements of the nonmoving party's case."  *Lynch Props., Inc. v. Potomac Ins. Co. of Ill.*, 140 F.3d 622, 625 (5th Cir. 1998); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Once the moving party meets this burden, the nonmoving party must set forth" — and support with credible evidence — "specific facts showing a genuine issue for trial and not rest upon the allegations . . . contained in its pleadings." *Lynch Props.*, 140 F.3d at 625; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  Such a showing must be made as to "every essential component of its case." *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998).  "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006) (internal quotation marks omitted).

The Court must draw all reasonable inferences in favor of the nonmoving party, but only if the summary judgment evidence shows that an actual controversy exists.  *See Anderson*, 477 U.S. at 255.  "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003).  A plaintiff may not "defeat a defendant's properly supported motion for summary judgment . . . without offering any concrete evidence from which a reasonable juror could return a verdict in his favor and by merely asserting that the jury might, and legally could, disbelieve the defendant's denial . . . ." *Anderson*, 477 U.S. at 256.

Rather, a plaintiff must present "affirmative evidence in order to defeat a properly supported motion for summary judgment . . . even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct

discovery." *Id*. at 257.  Here, Plaintiff has repeatedly acknowledged, and the Court has found, that she had a full opportunity to conduct discovery on the issue of liability.

## V.    MUNICIPAL LIABILITY UNDER § 1983

"[The] purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Juarez v. Aguilar*, 666 F.3d 325, 335 (5th Cir. 2011) (quoting *Wyatt v. Cole*, 504 U.S. 158, 161 (1992)).  However, section 1983 "is not itself a source of substantive rights; it merely provides a method for vindicating already conferred federal rights."  *Flores v. City of Palacios*, 381 F.3d 391, 404 (5th Cir. 2004) (quoting *Baker v. McCollan*, 443 U.S. 137, 145, n. 3 (1979)). Plaintiff must have "an underlying constitutional or statutory violation" as a "predicate to liability under § 1983." *Johnston v. Harris Cnty. Flood Control Dist.*, 869 F.2d 1565, 1573 (5th Cir. 1989).

More specifically, in order to establish municipal liability under § 1983, Plaintiff must prove: (1) the existence of an official policy or practice, of which (2) a municipal policymaker had actual or constructive knowledge, and (3) the policy or practice was the "moving force" behind a constitutional violation.  *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell v. Dep't. of Social Services*, 436 U.S. 658, 694 (1978)).

## VI.    DISCUSSION

Plaintiff does not complain of  any formally adopted City policies, but rather contends that the BSPD had *practices* of (1) not enforcing formal policies through supervision and discipline that would have prevented the assaults on D.B., and/or (2) failing to implement more effective formal policies to detect and deter sexual assaults by officers.  She further contends that these practices were the moving force behind the assaults on D.B.

The City contends that it appropriately supervised and disciplined its officers and that Rojo's independent criminal actions were the moving force behind the assaults on D.B., not any policy or practice of the City.

## A.  Municipal Liability—An Official Policy or Custom

Regarding the first "policy or practice" prong of municipal liability under § 1983, it is well-settled that municipalities are not responsible for constitutional violations committed by employees unless those violations result directly from official municipal policy.  *See*, *e.g.*, *City of Canton v. Harris,* 489 U.S. 378, 385 (1989); *Conner v. Travis Cnty.*, 209 F.3d 794, 796 (5th Cir. 2000) (per curiam).  The United States Supreme Court expressly rejected the premise that a municipality may be held liable under § 1983 based on a *respondeat superior* theory because in enacting § 1983, Congress included a requirement of *actual* culpability—versus constructive or vicarious culpability.  *Monell*, 436 U.S. at 693.  *See also Canton*, 489 U.S. at 385; *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown,* 520 U.S. 397, 415 (1997) (discussing that the municipal liability inquiry under § 1983 should not collapse into a *respondeat superior* analysis).

The requirement for an "official policy" serves to distinguish acts of the *municipality* — for which Congress intended municipalities to be directly liable under § 1983 — from acts of municipal *employees,* for which it did not.  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986) (emphasis in original); *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002).  In other words, a municipality may not be held liable under § 1983 solely because it hired an employee who became a constitutional wrongdoer.

Thus, to establish the first element of a § 1983 municipal liability claim, Plaintiff must show that the sexual assaults on D.B. were caused by action taken "pursuant to an official municipal policy."  *Monell*, 436 U.S. at 691.

An official policy may take one of two forms.  First, it may be in the form of a formal policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmakers or by an official to whom the lawmakers have delegated policymaking authority.  *Burge v. St. Tammany Parish*, 336 F.3d 363, 369 (5th Cir. 2003).  Second, an official policy may also be in the form of "[a] persistent, widespread practice of city officials or employees which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that," in effect, "fairly represents municipal policy."  *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc) (per curiam).  In other words, a de facto policy that, practically, has the force of law.[7]  *See Connick v. Thompson*, 563 U.S. 51, 61 (2011).  It is this latter form of policy that forms the basis for Plaintiff's claims.

To establish a practice of the City as a policy for § 1983 purposes, Plaintiff must show that there was "a pattern of abuses that transcends the error made in a single case."  *Piotrowski*, 237 F.3d at 582 ("A pattern could evidence not only the existence of a policy but also official deliberate indifference.").  Typically, a single "act is not itself a custom."  *Pineda,* 291 F.3d at 329.  Isolated violations are not usually viewed as the "persistent, often repeated, constant violations, that constitute custom and policy as required for municipal section 1983 liability."  *Bennett v. City of Slidell*, 728 F.2d 762, 768, n. 3 (5th Cir. 1984).  Moreover, "[p]rior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question."  *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 382–83 (5th Cir. 2005).

The Court will next address this "policy or practice" prong of § 1983 liability in connection with both practices alleged by Plaintiff above.

---

[7] This type of de facto policy is referred throughout as either a "practice" or "custom."

**1.  Whether there was a persistent, widespread practice within the BSPD of not enforcing formal policies through *discipline*?**

Plaintiff's failure-to-discipline claims rise or fall based on the similarity of Rojo's crimes to an incident involving another BSPD officer, Dustin Franco ("Franco"), and the City's resulting investigation and discipline of Franco.

Approximately four years prior to Rojo's crimes against D.B., Franco was accused of having inappropriate text and in-person communications with a juvenile he stopped for a curfew violation.  Plaintiff points to the Franco incident as a "clear warning" or "red flag" of the potential for sexual misconduct by officers in the absence of discipline and argues that the City ignored this warning.  Plaintiff contends that the Franco incident and resulting investigation is evidence of a similar "pattern of abuses" or a persistent, widespread failure by the BSPD to enforce formal policies through disciplining its officers.

Because the Franco incident is the only specific evidence Plaintiff offers in support of a "pattern of abuses" similar to Rojo's crimes, it is necessary to scrutinize the facts of that incident as taken from the record, which includes the related BSPD IA investigation file.

i.    The Franco incident[8]

Officer Franco stopped a juvenile as she walked down the street in the early morning hours of August 28, 2011.  He advised dispatch of the stop and gave his location, as required by BSPD policy.  He stopped his patrol vehicle in a parking lot away from traffic so did not turn on his overhead lights which would have automatically activated his vehicle's video recorder.  And he claimed that he forgot to manually activate both his vehicle's video recorder or his belt audio recorder, both also required by policy.  Dkt. No. 31-2 at 83–85.

---

[8] Dkt. No. 31-2 at 75–92.

As Franco asked the juvenile for identification and contacted dispatch to check for warrants, a female BSPD officer, Terri Lovell ("Lovell"), arrived on the scene. It is unclear from the record whether Lovell happened on the scene or was dispatched to assist Franco. *Id.*

The juvenile informed the officers that her mother was out of town and that the juvenile was staying with an adult male friend of the mother for the weekend. Lovell recalled in her IA statement that she asked the juvenile, "why her mother would let her stay with an adult male alone because Lovell advised that looked bad and the adult male could take advantage of the juvenile female." *Id.* at 88. In response, the juvenile told Lovell that nothing like that had happened and that her mother trusted this adult male. *Id.* Franco meanwhile contacted his supervisor because he was having difficulty contacting the juvenile's mother. Lovell continued in her IA statement to say that she "found it hard to believe that a mother would let her teenage daughter stay alone in a city by herself[,]" but that when Franco got the mother on the phone, the mother instructed Franco to take her daughter to the mother's friend's house. *Id.* Franco issued the juvenile a curfew citation, notified dispatch of the transport and his mileage, as required by policy, and drove her to the house. *Id.* at 84, 89.

Lovell further recalled in her IA statement that when she was questioning the juvenile about her staying by herself with an adult male, the juvenile said that she "did not know how this was helping." *Id.* at 89. Lovell advised the juvenile that "the adult male could take advantage of the juvenile female" and that "the scenario looked bad that a [female of her age] and an adult male were left alone with the mother of the teenager in another city and unable to respond if the teenager was in trouble." *Id.* Lovell said that the juvenile "seemed to understand at that point and insisted that she and her mother trusted the adult male, so Lovell did not continue questioning on that subject." *Id.*

In his statement to IA, Franco recalled that during his transport of the juvenile to her mother's friend's house, the juvenile asked him when his shift ended, and he said at 6:00 a.m.  She then asked whether he would stop at a store so she could get something to eat.  He refused and took her directly to the house.  Upon arriving at the house, Franco reported his ending mileage to dispatch as required by policy.  The juvenile told Franco that she was afraid and asked him to inspect the inside of the house.  Franco did so and, finding no one inside, he departed.  *Id.* at 84.

Franco called the juvenile thirty minutes later to confirm her city of residence for the citation and, during this call, she again asked him to take her to get something to eat.  He again refused and ended the call.  *Id.*

Sometime later, Franco felt sorry for the juvenile and texted asking if she wanted a snack from the store.  She texted that she did, and Franco later brought chips and a candy bar to the door of the house.  The juvenile reimbursed Franco for the snacks and he left without entering the house, telling her that he "shouldn't even be here." *Id.* at 84–85.

The juvenile's statement to the IA investigators describes a different encounter.  According to her, upon initially arriving at the house, Franco said he needed to ensure no one else was inside.  He searched the house, but then asked where she slept.  She told him and he departed.  *Id.* at 77–78.

The juvenile claimed that Franco called her around 1:44 a.m. to verify her name and date of birth, and again at 3:20 a.m. to ask if she was still hungry.  She told Franco that she wanted a snack and he said that he would bring one.  They exchanged several more texts related to his delay in arriving due to being dispatched to other calls and, at one point, he texted asking when her mother would return.  She said at 10:00 a.m.  *Id.*

The juvenile reported that when Franco arrived at the house with the snacks, he "let himself in." *Id*. at 78.   She asked him if he would get into trouble for bringing her snacks and he asked if she was going to report him.  She responded, "if a cops gonna bring me chips I'm not gonna tell on him." *Id*.  She reported that he then told her that he pulled her over because he thought she was 19 or 20 years old, and she responded that she was 16 years old. *Id*.

The juvenile claimed that Franco then told her that she was "a very beautiful girl," asked if she had a boyfriend, how old the boyfriend was, and whether they were "serious," before finally asking, "Can I kiss you?" *Id*.  She told him that she did not "cheat" and that it did not "feel right with him asking." *Id*.  She reported that he then asked for a hug, and she declined.  He then asked when her friend was returning, and she said around 5:00 or 6:00 a.m.  She claims Franco then said, "Oh I thought I might come back when my shift ended at 6," and she told him that she was "about to pass out." *Id*.  Franco then asked her, "can I still text you" and she said "sure" and he departed.  Finally, she reported that he texted "Glad I met you" at 5:09 a.m. *Id*.

ii.  <u>The Franco investigation</u>

The day after the curfew stop, on August 29, 2011, the juvenile's mother filed a complaint against Franco with the BSPD for having inappropriate text and in-person communications with her daughter.  An IA investigation was initiated that same day, and the IA investigator issued a letter also that same day to the juvenile's mother acknowledging receipt of her complaint and advising her of the assigned IA case number and that the investigation should take no longer than thirty (30) days.  Dkt. No. 31-2 at 76.

These steps appear to be consistent with the BSPD policy governing the Internal Affairs Process, Policy 2.4. *Id*. at 21–30.

Two days after receiving the complaint, on August 31, 2011, the IA investigator had secured the statement of the juvenile (*Id.* at 77–78) and notified Franco of the complaint and, specifically, that it had been alleged that he had engaged in inappropriate conversations and text messages with the juvenile. *Id.* at 79. The IA notice to Franco also informed him of the specific policies he was suspected of violating, identified his role as that of a "SUSPECT" and directed him to notify his immediate supervisor of the complaint within 24 hours. *Id.* Franco was also directed to make a written response to the allegations within the same 24-hour period. *Id.* That same day, two days after the complaint had been filed, Franco was given an Administrative Suspect Warning notice, advised of his rights under *Garrity v. New Jersey*,[9] and issued a Lawful Order to Answer Questions from then-Chief Lonnie Smith ("Chief Smith"). *Id.* at 80–81. These steps also appear consistent with BSPD Policy 2.4.

Franco was also informed that the investigation would include whether he failed to activate the audio and video equipment in his vehicle and failed to download audio recordings from his digital audio recorder as required by policy. *Id.* at 79.

That same day, August 31, 2011, the statements of both Officer Franco and Officer Lovell were secured by the IA investigator. *Id.* at 83–89.

In his IA statement, Franco denied: asking the juvenile where she slept, entering the residence when he delivered the snacks, telling the juvenile that he pulled her over because he thought she looked 20 years old, asking about her boyfriend, asking for a kiss or hug, asking if he could come back after his shift, and asking what time her friend was to return. *Id.* at 85. Franco admitted bringing the juvenile snacks and to two text messages with the juvenile after he delivered

---

[9] *Garrity v. New Jersey*, 385 U.S. 493 (1967).

the snacks, but maintained that the texts were to the effect of her thanking him, telling him she was going to sleep, and that he was glad to have met her. *Id.* at 83–85.

Lovell's statement to the IA investigators states that she did not observe Franco say or do anything inappropriate toward the juvenile. *Id.* at 89. She then goes on to describe her questioning the juvenile about her mother's decision to allow her to stay with the mother's friend before concluding that she "cannot determine anything else that the juvenile female was upset about or seemed offended about." *Id.*

The Chief of Police at the time of the Franco incident and investigation was Chief Smith. Prior to Williams becoming chief, he worked under Chief Smith and was familiar with his policies and practices, and how Chief Smith implemented the IA and disciplinary rules. Dkt. No. 31-4 at 7. Chief Williams testified that Chief Smith ran a "tight ship" regarding discipline and following procedures. *Id.* Chief Williams also testified that, based on his knowledge of Chief Smith, "if [Chief Smith] had found anything to go forward on [the Franco incident] . . . he would have gone forward to ensure that . . . we come to the right conclusion." *Id.* at 9.

It appears from the record that the IA investigation into the Franco incident concluded that Franco violated some policies regarding recording his interactions with the juvenile, but that the more serious allegations involving inappropriate conversations and texting with the juvenile were "not substantiated" due to conflicting accounts of what happened. *Id.* at 7–9. BSPD Policy 2.4 allows for a completed IA investigation to be classified as "[n]ot sustained" if the investigation was "unable to verify the truth of the matter under investigation." Dkt. No. 31-2 at 30. That appears to be what happened here.

The record contains a letter dated December 19, 2011, from Chief Smith to the mother advising her that he reviewed the statements of her daughter, Franco, and Lovell, and concluded

that "there were violations of Department procedures and inconclusive findings on some but I have taken action I believed appropriate . . . and will be monitoring Officer Franco's action or interaction with those he comes into contact with." [10]  *Id.* at 92.

Chief Williams testified that he believed Chief Smith "counseled" Franco as a result of the IA investigation.[11]  Dkt. No. 31-4 at 7.

The Court notes that the only descriptions of the alleged texts in the record are those reflected in the IA statements of Franco and the juvenile, summarized above.

 iii. Application of Franco incident to Plaintiff's failure to discipline claim

Plaintiff's expert, Roger Clark ("Clark"), stated in his report that the BSPD's IA investigation file on the Franco incident "shows almost no investigation was done" (Dkt. No. 39 at 36) and that the investigation was "shoddy and incomplete." Dkt. No. 39-1 at 15.  However, Clark does not cite to specific facts supporting this opinion, except to say that the investigation "would obviously include a search of Franco's known past patrol activities for other similar contacts and possible victims."  *Id.* at 12.  There is no evidence in the record regarding whether such a search was or was not performed and, if not, why not.  However, assuming one was not performed, it would be speculative to conclude that such a search would have uncovered additional victims of Franco.  There is no evidence that Franco, prior to August 2011, had been suspected or accused of similar misconduct, of a lack of candor, or of violating any other policy or practice of the BSPD.

---

[10] This letter was prompted by a second complaint filed by the mother against Franco on December 2, 2011, after she was pulled over by Franco for speeding while her daughter was in the vehicle. The mother also did not have her driver's license and the vehicle had a buyer's tag that was illegible to Franco. Although Franco released the mother with only a written warning, the mother complained that she felt like she was being harassed by Franco and demanded to know why he had not been removed from duty based on her previous complaint. *See* Dkt. No. 31-2 at 90. This letter was in response to the mother's inquiry about the August 2011 incident.

[11] Plaintiff's assertion that Franco received "no discipline whatsoever" is factually incorrect and not supported by the record to the extent that he did receive informal discipline in the form of counseling.  Dkt. No. 39 at 56.

The record reflects that within 48 hours of the complaint being filed against Franco, the written statements of the only three witnesses in that investigation had been taken by the IA investigator. However, the fact that there were only three witnesses from whom statements could be taken and the fact that the only two material witnesses — Franco and the juvenile — offered conflicting statements does not reflect on the quality of the investigation. Such facts are beyond the control of the IA investigator, and those facts appear to have determined the depth, breadth, and inconclusiveness of the investigation.

Otherwise, Clark does not identify any witness that was not interviewed who should have been. And other than the "search of Franco's known past patrol activities," Clark does not identify any other investigative steps that should have been taken that were not.

In an attempt to link the Franco incident to the assaults on D.B. four years later, Clark concludes that, based on the Franco incident and investigation, "Rojo would count on the same lack of administrative oversight" and that Rojo "was able to use the BSPD's failures to make the necessary changes in 2011 to his advantage in 2015 when he was free to select and molested [sic] his juvenile victims." *Id.* But even if the Court infers that there was a lack of administrative oversight four years prior in connection with the Franco incident and investigation, there is no evidence in the record that Rojo knew of the Franco incident, how it was investigated, or the type of discipline Franco received. *Id.*

In response to Franco only receiving informal discipline, Clark opined that:

> The lack of appropriate discipline, particularly for the requirements to record interactions with juvenile females could only encourage further misconduct in the rank and file. This response fostered the culture of lassitude and created an organizational environment that the Chief of police and his command staff would conduct a less honest and robust investigation into misconduct, and instead would look the other way.

Dkt. No. 39-1 at 15.

Clark's conclusion that a lack of discipline "could only encourage further misconduct in the rank and file" is conjecture without factual support in the record.  Franco is the only example Plaintiff offers of a possible "lack of appropriate discipline," and it is not clear on the record here that there was a lack of appropriate discipline in connection with that incident.  And even if the Court infers that the Franco investigation was inadequate, there is no evidence of a lack of discipline or a "less than honest or robust investigation into misconduct" in the intervening four years between the Franco incident and Rojo's crimes.

The Court is uncertain of what "further misconduct in the rank and file" Clark believes was somehow encouraged by the Franco incident since the record is devoid of evidence that Rojo — the only other officer this Court has evidence of having violated BSPD policy following the Franco incident — or any other rank and file officer, other than Lovell, knew about the Franco incident.

And there is no evidence that any rank and file officer, including Lovell, knew of the outcome of the Franco investigation, the type of discipline Franco received, or was somehow encouraged by either the incident itself or the manner in which the BSPD investigated and concluded it.  In sum, there is simply no evidence of "further misconduct in the rank and file" between the time of the Franco incident and Rojo's crimes.  While the Court must make reasonable inferences about the facts in Plaintiff's favor, it cannot also assume those facts exist in the absence of some evidence, nor can it make unreasonable inferences.

Clark also finds fault with Chief Smith's decision to not refer the Franco incident to the Texas Rangers for an investigation.  However, the only evidence in the record regarding the proper bases or criteria used by Texas police departments in making such referrals is BSPD Policy 2.4 which provides that "[d]epending on the nature of the complaint, the Chief of Police may request another agency or DPS to undertake the investigation."  Dkt. No. 31-2 at 22.  This appears to vest

20

the chief with discretion on whether to make such a referral.  Based on this record, the Court is unable to conclude that Chief Smith abused his discretion by not referring the matter.  And the Court is unwilling to otherwise assume that there was something improper regarding Chief Smith's decision to not refer allegations to the Texas Rangers that he determined, after the IA investigation, to be unsubstantiated.   To do otherwise would require the Court to assume that all allegations of police misconduct in Texas, substantiated and unsubstantiated alike, must be referred to the Texas Rangers.  Such a requirement would certainly seem impractical, if not impossible.

Additionally, Clark concludes that Chief Williams "ignor[ed]" the Franco IA report when he re-hired Franco and that this was a "classic example of Chief Williams 'looking the other way.'" Dkt. No. 39-1 at 14.  The only evidence in the record on this point is that the IA report was not made available to Chief Williams at the time he re-hired Franco, and that only Franco's personnel file was made available, which would not have included any informal discipline.  Chief Williams stated in his affidavit  that "all formal discipline is noted in an officer's personnel file" and "there was no formal discipline noted in the personnel file of Officer Dustin Franco in connection to allegation of misconduct that supposedly occurred on or about August 28, 2011."  Dkt. No. 31-1 at 2. This, too, appears consistent with BSPD Policy 2.4 which provides that "[s]ustained complaints shall be filed in the individual employee's department personnel file."  Dkt. No. 31-2 at 30.[12]

Even if Chief Williams had access to the Franco IA file, there is nothing in the record that would necessarily disqualify Franco from being re-hired.  Dkt. No. 31-1 at 2.  And the record is devoid of any evidence suggesting that Franco's re-hiring resulted in any other complaints or misconduct of any kind by Franco.

---

[12] There is some evidence that the re-application process does not seek information about previous IA investigations, so Franco may not have been asked to provide this information.  Dkt. No. 31-5 at 8.

Plaintiff also points to the deposition testimony of Chief Williams and Sergeant Tony Everett ("Sergeant Everett") as evidence of a custom of lax discipline. According to Plaintiff, Chief Williams testified that he did not recall a single instance of *formal* officer discipline for failure to record interactions with the public, failure to activate vehicle recording devices, or failure to announce mileage during juvenile transport. Dkt. No. 39 at 38 (emphasis added).

Likewise, Sergeant Everett testified that he did "not recall anyone being disciplined (no discipline by himself, nor any other supervisor) for the failure to call in mileage." *Id.* at 29.

Assuming these statements are accurate, Chief Williams testified that there were several instances of *informal* discipline for failing to activate the audio/visual recording devices in police vehicles over his five years as chief. Dkt. No. 31-4 at 5; Dkt. No. 39-7 at 15–19. And Sergeant Everett testified that he recalled officers being questioned about failing to call in mileage. Dkt. No. 31-6 at 23.

Regardless, the mere absence of *formal* discipline for non-specific instances of failing to activate the recording devices or failing to announce juvenile transport mileage by itself does not create a fact issue on whether more discipline was warranted in those instances. The Court is unable to assume as fact that these instances required formal discipline, as opposed to informal, or no discipline at all. BSPD Policy 2.4 provides that "[d]isciplinary action taken shall be determined by the seriousness of the violation or the extent of the injury to the victim, and the officer's prior disciplinary history" and "shall be commensurate with the circumstances surrounding the incident, and the employee's service record, including prior sustained complaints, will be considered." Dkt. No. 31-2 at 30. Whatever these criteria may have been for the non-specific instances referenced, those facts are not in the record. Nor are there any other facts in the record from which the Court can reasonably infer that these non-specific instances warranted formal versus informal discipline.

Plaintiff attempts to equate the absence of *formal* discipline in a handful of non-specific instances of failing to activate recording devices or failing to announce juvenile transport mileage to a persistent, widespread practice of failing to discipline, arguing that "this does not mean that violations were rare; to the contrary, we know that Rojo repeatedly disregarded the rules . . . and Franco (in his statement) admitted repeatedly to failing to comply with the written policies." Dkt. No. 39 at 38–39.

But with that, which the Court accepts as true for purposes of summary judgment, Plaintiff exhausts her *specific* examples of discipline issues within the BSPD, a police department consisting of as many as forty-eight police officers. Dkt. No. 31-5 at 8–9. And the only failures Franco admitted were those related to not recording his interactions with the juvenile on August 28, 2011, even though one of those interactions occurred with a female officer present and with Franco apparently in regular contact with dispatch and/or his supervisor. And there is no evidence that either Chief Smith or Chief Williams knew of Franco and Rojo's violations or condoned them, tacitly or otherwise. To the contrary, the record is clear that when their violations of policy become known to their chiefs, each was immediately subjected to an IA investigation and received some form of discipline, albeit one informal.

And that Franco and Rojo, four years apart, *violated* policy unbeknownst to their chiefs, and deserved some form of discipline for doing so, does not create a fact issue on the existence of a persistent, widespread failure by the BSPD to *enforce* policy through discipline, particularly when both were investigated and disciplined. And, again, this Court is unable to say now on this record that Franco's informal discipline was either inappropriate based on an application of the criteria set out in BSPD Policy 2.4 or disproportional to claims Chief Smith determined, at the time and upon a better record than is before this Court, to be unsubstantiated as to the most serious.

Plaintiff points to *Sharp v. City of Houston*, 164 F.3d 923, 935 (5th Cir. 1999) for the proposition that "few example[s] of discipline does not disprove 'tacit authorization' of wrongful conduct."  Dkt. No. 39 at 31.  *Sharp* is distinguishable from the instant case.  Patrice Sharp, a former Houston Police Department officer, alleged that the Houston Police Department maintained a "code of silence" that encouraged officers to turn a blind eye to each other's misconduct, and that his co-workers and supervisors punished violations of the code through retaliatory acts.  164 F.3d at 935.  In affirming a judgment entered on a jury verdict in favor of Sharp, the Fifth Circuit concluded that a jury could have decided that "the city's steps to eliminate the code were merely cosmetic or came too slowly and too late to rebut tacit encouragement" and that "the failure of Sharp's supervisors all the way up the chain of command . . . to take any real action when made aware of the retaliation supports a conclusion by the jury that the HPD had a policy, custom, or practice of enforcing the code of silence."  *Id.*

Unlike in *Sharp*, when Chief Williams received information relating to the allegations of sexual misconduct against Rojo, he did not take action that could be considered "merely cosmetic" or insufficient to rebut tacit encouragement of policy violations.  Instead, he immediately placed Rojo on administrative leave, referred the matter to the Texas Rangers for a criminal investigation, and initiated an IA investigation.  That Rojo found his way around these policies in the first place does not, without more, lead to the conclusion that Chief Williams or the BSPD routinely tolerated widespread violations of policy.  Nor does the BSPD response to the Franco incident, for the reasons explained below, appear to have been either merely cosmetic, too slow, or too late to rebut claims of tacit encouragement.

The evidence shows that the BSPD, when notified by the juvenile's mother of her complaint about Franco, immediately initiated an IA investigation and, within a couple of days,

had gathered the sworn statements of the only three witnesses to Franco's interaction with the juvenile.  The BSPD also immediately notified Franco that he was a suspect, advised him of the specific policy provisions he was accused of violating, and ordered him to notify his supervisor and submit a written statement within 24 hours.  Again, these steps appear to be consistent with BSPD Policy 2.4.  Dkt. No. 31-2 at 21–30.

Plaintiff's expert, Clark, makes no effort to apply BSPD Policy 2.4 to the facts of Franco's incident.[13]  He does not mention the extent of the injury to the alleged victim.  He does not discuss Franco's prior disciplinary history.  Clark simply concludes, apparently based on the uncorroborated statement of the juvenile, that "Franco should have been subject to significant discipline – even discharge" without addressing how "significant discipline – even discharge" is somehow commensurate with the circumstances surrounding the incident and Franco's service record, including prior sustained complaints, if any.  Dkt. No. 39-1 at 12.  Such a conclusion is unsupported by this record.

There is no evidence that, prior to August 28, 2011, Franco had ever been previously disciplined, had any sustained complaints against him, or otherwise had anything negative in his service record.  Again, there is no evidence that Franco had ever previously been suspected or accused of similar misconduct, of a lack of candor, or of violating any other policy or practice of the BSPD.  And this is after the parties have had the opportunity to fully develop the liability issues through discovery.

---

[13] As stated above, BSPD Policy 2.4 provides that "[d]isciplinary action taken shall be determined by the seriousness of the violation or the extent of the injury to the victim, and the officer's prior disciplinary history" and "shall be commensurate with the circumstances surrounding the incident, and the employee's service record, including prior sustained complaints, will be considered."  Dkt. No. 31-2 at 30.  This BSPD policy was among the material Clark reviewed in reaching his opinions.  Dkt. No. 39-1 at 3–4.

As noted above, Chief Williams testified that he believed former Chief Smith "counseled" Franco as a result of the IA investigation.[14]  Dkt. No. 31-4 at 7.  Per BSPD Policy 2.4, "[c]ounseling is used to adjust and correct minor, infrequent errors or instances of poor performance and to ascertain the nature of any professional or personal problems that bear on performance."  Dkt. No. 31-2 at 22.

The evidence shows that Chief Smith was faced with conflicting accounts of what transpired between Franco and the juvenile and that the mother and daughter were possibly upset by officer questions about the juvenile being allowed to stay with an adult male friend of the mother.  It is not clear on this record whether or how this evidence factored into the credibility determinations that were made by Chief Smith in the Franco IA investigation, the type of discipline Chief Smith determined to be appropriate, or which allegations he determined should be sustained. Regardless, the Court is not in a position to second-guess those decisions on this record.  Nor does the Court have evidence that whatever policy violations were sustained against Franco were anything more than "minor, infrequent errors or instances of poor judgment" that warranted nothing more than counseling per BSPD Policy 2.4.

Even taking everything Plaintiff argues about the inadequacy of the Franco investigation and discipline as true, she still fails to show a pattern of failing to discipline for policy violations prior to the assaults on D.B.  "[I]t is nearly impossible to impute lax disciplinary policy to the City without showing a pattern of abuses that transcends the error made in a single case."  *Piotrowski*, 237 F.3d 582 (citing *Brown*, 520 U.S. at 410–11).  Here, whatever errors occurred in the handling of the Franco incident, that incident was a single incident.  Moreover, that incident and its

---

[14] Plaintiff's assertion that Franco received "no discipline whatsoever" is factually incorrect and not supported by the record.  Dkt. No. 39 at 56.

investigation and resulting discipline occurred under a different police chief four years prior to Rojo's crimes against D.B.

Moreover, prior incidents must also be "fairly similar to what ultimately transpired." *Estate of Davis*, 406 F.3d at 383.  In use of force cases, for instance, the prior act must have resulted in injury to a third party.  *Id.*  Even assuming the juvenile's claims against Franco were true, what ultimately transpired in that case cannot be described as similar to what ultimately transpired in D.B.'s case.

Much is unknown on this record regarding the details of the Franco incident and investigation.  Plaintiff argues that this is true, at least partially, because the IA investigation into that incident was "shoddy and incomplete."  But for reasons unknown to the Court, and despite the importance of that incident to the claims in this case, the record here is devoid of deposition testimony from Franco, former Chief Smith, the IA investigator, Officer Lovell, the mother and daughter involved, or anyone else who might have provided specific facts regarding the Franco incident or investigation.  As a result, the Court is left to assume that these depositions, like those of Rojo and the parties' experts, were deemed by the parties as unnecessary and superfluous to the issue of liability.

While the Court must draw all reasonable inferences in favor of the nonmoving party, it is not required to assume what key witnesses might have said.  As stated above, the burden is on Plaintiff to present affirmative evidence at this stage, even where that evidence may be within the possession of the City or Rojo, as long as Plaintiff has had a full opportunity to conduct discovery, which she has acknowledged.

Conclusory allegations by Plaintiff's expert regarding the sufficiency and outcome of the Franco investigation on a cold review of the file do not, without more, create a fact issue on

whether there was a persistent, widespread practice within the BSPD of not disciplining officers who violate policy.  While the Court stops short of excluding Clark's report from the summary judgment evidence, that report contains numerous instances of unsupported conclusions, hyperbole, and statements ringing more of advocacy than objective opinion.

Taken cumulatively, the issues with Clark's report cause the Court to seriously question the reliability of the opinions expressed therein.[15]  Moreover, "an expert's opinion should not be alone sufficient to establish constitutional 'fault' by a municipality in a case of alleged omissions, where no facts support the inference that the town's motives were contrary to constitutional standards."  *Stokes v. Bullins*, 844 F.2d 269, 275 (5th Cir. 1988).  Here, even after considering whatever scintilla of evidence can be distilled from Clark's report, there is insufficient evidence to support such an inference.

Ultimately, the question is whether a reasonable juror could conclude on this record, by a preponderance of the evidence, that there was a practice within the BSPD of not disciplining officers for violating policies, and further that this practice was so persistent, widespread, common, and well-settled to, in effect, constitute official BSPD policy.  The Court concludes that one could not.

**2.   Whether there was a persistent, widespread practice within the BSPD of not enforcing formal policies through *supervision*?**[16]

Plaintiff contends that the City's "constitutionally deficient policies and customs, and failures" to supervise, monitor, and discipline its police officers "allowed" Rojo "repeatedly to hold minor girls, and other females, for solitary questioning in rooms not visible from the outside, to abuse them, and lewdly to photograph them literally in the police station."  Dkt. No. 1-3 at 2, 5.

---

[15] *See Muñoz v. Orr*, 200 F.3d 291, 302 (5th Cir. 2000).
[16] The Court finds no substantive difference between Plaintiff's failure-to-supervise claim and her failure-to-monitor claim.  Accordingly, they are analyzed as one claim.

More specifically, Plaintiff argues that the City had "practices . . . that allow[ed] police officers, even in controlled, non-emergency situations: (1) to be alone and unobserved with [juveniles]; (2) to question [juveniles] of the opposite sex in custody in an office unobserved and with no other person; (3) to take custody of [juveniles] of the opposite sex in a police station, and to separate [juveniles] from their parents, guardians, and other responsible adults so that they are alone and unobserved; and (4) to transport [juveniles] in custody to and from the police station, alone and unobserved in police vehicles, even when a [juvenile] has a parent, guardian, or other responsible adult available to bring the [juvenile] to and from the station." *Id*. at 10–11.

The City responds that the evidence does not establish that it had practices of not supervising or disciplining its officers, especially regarding interactions with female minors and adherence to policies.  Dkt. No. 42 at 12.  To the contrary, the City claims it maintained appropriate standards for supervision that governed officer conduct while in the office, on patrol, and in the field, including policies directly tailored to officer interaction with minors.  Dkt. No. 30 at 14, 36–37.

Specifically, the City argues that it had policies requiring officers to (1) contact a parent, guardian, or custodian upon taking a juvenile into custody and/or upon arriving at the station with a juvenile, (2) announce to dispatch the mileage at the beginning and end of juvenile transports, (3) use in-vehicle video recording of interactions with the public, and (4) record audio of all interactions with the public with belt-mounted recording device. *Id*. at 14.

The City also had policies and/or rules requiring (1) motion and audio-activated live video/audio feed and recording in all detective offices, (2) supervisor spot-monitoring of video/audio feeds and closed door interviews, (3) unlocked office doors during detective interviews of juveniles, (4) whiteboard monitoring of detective and supervisor whereabouts, (5)

supervisor/officer one-on-one case reviews every two or three months, and (6) supervisor spot-monitoring of detective radio transmissions. *Id*. at 13–16.

In addition to these policies and practices, the City also had policies forbidding criminal conduct and requiring officers to comply with all federal and state laws. *Id*. at 28–29.

Further, the City asserts that Rojo's first-line supervisor, Sergeant Everett, was a "hands-on" supervisor who closely monitored the five detectives he supervised (*Id*. at 36), and that neither Sergeant Everett nor anyone else in Rojo's chain of command ever received a complaint about Rojo during his eight-year tenure with the BSPD. Dkt. No. 30 at 13–14; Dkt. No. 31-1 at 1–2; Dkt. No. 31-5 at 13–14. The City also argues that the 5:1 officer-to-supervisor ratio in Rojo's detective squad enabled closer supervision than is typically found in most police departments. Dkt. No. 31-8 at 35–36.

The City contends that it was unaware of any misconduct by Rojo prior to the complaint by C.A.K., and had no reason to suspect misconduct by Rojo during the time when he assaulted D.B. Rojo, the City argues, had an unblemished record with the BSPD at the time the assaults occurred and had successfully passed an extensive background investigation as part of the BSPD hiring process, which included a polygraph examination, psychological review, and criminal background check. Dkt. No. 30 at 8–9, 12.

The City points out that, prior to assuming his position with the BSPD, Rojo received training at the police academy regarding, among other things, sexual offenses, official oppression, and civil rights violations. Dkt. No. 31-1 at 2. The City also required more continuing in-service training than required by the Texas Commission on Law Enforcement. *Id*. Rojo satisfied this additional training requirement each year he was employed by the BSPD, including training on sexual harassment recognition, sex offender characteristics, and child abuse prevention and

investigation. *Id.*; Dkt. No. 31-2 at 44–49. Nothing in his background or conduct revealed any reason for his chain of command to suspect that he would sexually assault someone. Dkt. No. 30 at 30.

The City maintains that Rojo's independent criminal actions were "carried out in secrecy and subterfuge" in violation of both City policy and state law. *Id.* at 10. And once the City became aware of Rojo's misconduct, it immediately placed him on administrative leave, referred the matter to the Texas Rangers for a criminal investigation, initiated its own IA investigation, and, ultimately, fired him. *Id.* at 17; Dkt. No 31-1 at 1.

The City argues that at some point police officers must be allowed "to function as police officers," which necessarily requires a high degree of autonomy, particularly among detectives. Dkt. No. 30 at 30. And there was nothing in Rojo's background or performance that suggested Rojo would sexually abuse juveniles in the absence of closer supervision. *Id.* at 30–31. In the absence of such indication, the City maintains that it should not be liable for assuming that Rojo would not violate the law. *Id.* at 42, 46–47. Considering all the policies and practices the City had in place, the City argues that one detective's disregard of them does not constitute a persistent, widespread practice sufficient to impose liability on the City under § 1983.

Plaintiff acknowledges that the City had written policies in place that might have prevented the assaults on D.B. but argues that the BSPD supervisors failed to effectively supervise and monitor compliance with these policies, thus rendering them "meaningless" and allowing Rojo's sexual assaults to occur undetected. Dkt. No. 39. at 11–12, 14, 20–40.

Specifically, Plaintiff complaints of the frequency with which Sergeant Everett monitored his detectives' radio transmissions, monitored the live video/audio feed from detectives' offices,

and reviewed detectives' video and audio recordings.  Dkt. No. 39 at 26–32; Dkt. No. 39-5 at 7; Dkt. No. 39-9 at 25, 45; Dkt. No. 39-8 at 40.

She also complains that the detectives could bring persons into the police station without a supervisor's knowledge, by-pass presenting juvenile detainees to a magistrate judge, and that supervisors did not ensure that officers contacted a parent or guardian when a juvenile was brought to the station.  Dkt. No. 39 at 28–29; Dkt. No. 39-9 at 30–31.

Finally, she complains that the whiteboard monitoring could be evaded by detectives and that supervisors did not spot-check the interior of detective vehicles.  Dkt. No. 39 at 24, 26; Dkt. No. 39-9 at 34.

Additionally, Plaintiff's expert, Clark, concludes that Rojo's "chain of command, [including] Rojo's supervisor, Sergeant Tony Everett . . . utterly failed in their respective duties to command, supervise, and monitor Rojo" and "their systemic failures resulted in an organizational culture so extraordinarily lax and careless that it allowed [1] Rojo to act undetected and [2] with an obvious expectation of impunity."  Dkt. No. 39 at 41.

Accepting Plaintiff's alleged deficiencies as true, the issue in this case is not whether supervision could have been better.  *See Canton*, 489 U.S. at 391.  With the benefit of hindsight, improvements in supervision can almost always be identified.  Nor is the issue whether Sergeant Everett or the other BSPD supervisors were negligent in the performance of their supervisory duties.  Here, the sufficiency of the City's actions must be judged by what was known at the time, and against standards for § 1983 liability, not under the rubric of negligence.

As mentioned above, municipal liability under § 1983 has rigorous requirements of culpability and causation to prevent it from collapsing into *respondeat superior* liability. "Congress did not intend municipalities to be held liable unless *deliberate* action attributable to

the municipality directly caused a deprivation of federal rights." *Brown*, 520 U.S. at 415 (emphasis in original).

As a result, Plaintiff must offer enough credible evidence from which a reasonable juror could conclude not only that the alleged failed supervisory practices existed with the BSPD, but that they were so persistent, widespread, common, and well-settled to, in effect, constitute formal BSPD policy. *See Webster*, 735 F.2d at 841.

The record reflects that Chief Williams spot-monitored the live video/audio feeds from detective offices once or twice a week. Dkt. No. 31-4 at 11. Lieutenant Gordon testified that he also spot-monitored the live feeds and would walk into detectives' offices unannounced. Dkt. No. 31-5 at 12. Additionally, anyone in BSPD administration or supervision had the ability to monitor the live feeds at any time. Dkt. No. 39-7 at 31–32; Dkt. No. 31-7 at 2. The office video/audio system operated continuously and was automatically activated by either motion or sound. Dkt. No. 31-7 at 2. All of this appears undisputed. In describing the BSPD station, Sergeant Everett testified that "with every camera in there and all of us milling around . . . there's a lot of checks and balances in place to stop [sexual misconduct by officers]." Dkt. No. 31-6 at 28–29. And as Lieutenant Gordon testified, "what Rojo did was do everything he could to go undetected," so whatever policy the BSPD could have implemented, Rojo would have circumvented. Dkt. No. 39-8 at 5.

Sergeant Everett testified that he, like Lieutenant Gordon, did not hesitate to enter detective offices even if the door was closed. *Id.* at 14–15. He had access to detectives' recordings and could review them when he reviewed the electronic file as part of the case review. *Id.* at 9–10. Sergeant Everett ordered his detectives to attach all recordings of office interviews to the relevant case file immediately after recording. *Id.* at 16. And he could also ask a detective to pull up videos

of interviews or he could obtain a copy of the recording directly from IT.  *Id*. at 12.  All of this also appears undisputed.

Sergeant Everett testified that he required the detectives to record all contact with citizens and would listen to their recordings "a lot of times."  *Id*. at 19.  He acknowledged that he could not listen to all of the recordings because there were "too many of them."[17]  Dkt. No. 39-5 at 7. Sergeant Everett stressed the importance of police practices with his detectives which included recording all interactions with the public.  Dkt. No. 31-6 at 25–26.  His orders were "don't do anything without a camera being on, or recorder, if you're around a citizen."  *Id*. at 27, 30.  He believed in using recording devices and demanded that detectives always activate their recording systems.  *Id*. at 20–21.  Here again, no one testified to the contrary.

Moreover, Rojo had reported a problem with his in-vehicle recording system within a year prior to the assaults on D.B., from which it was reasonable for his supervisors to assume that he was using it.  Dkt. No. 39-5 at 7; Dkt. 31-2 at 51; Dkt. No. 31-2 at 58, 64.

Sergeant Everett also testified that he instructed detectives on the policy regarding reporting juvenile transports to dispatch and that officers also received training on this topic.  Dkt. No. 31-6 at 31.  He testified that he monitored their compliance with this policy by monitoring radio transmissions.  *Id*.  He listened to his radio "quite a bit," could hear his detectives reporting their transports and mileage, and that they were good at reporting their transports.  *Id*. at 21, 31. In fact, even Rojo reported some of his transports and mileage in connection with his transports of D.B., C.A.K., and other juveniles.  Dkt. No. 39-3 at 4, 6, 13–14, 44; Dkt. 39-4 at 4–6; Dkt. No. 31-2 at 60–65.

---

[17] The Texas Ranger who investigated the Rojo crimes was also aware that Rojo alone had a heavy caseload.

As for Plaintiff's complaint that that there was no "hard and fast requirement" that Sergeant Everett monitor his radio more frequently, there is evidence in the record that patrol sergeants needed to monitor patrol officer's radio transmissions more frequently than detective supervisors in case the patrol officers needed supervisory assistance in the field.  Dkt. No. 39-8 at 40.

And regarding the one-on-one case reviews, Sergeant Everett testified that these reviews enabled him to monitor detectives' progress in their cases and they occurred every two or three months.  Dkt. No. 31-6 at 4–5.  He described the case reviews as "a long, drawn out process" that would take between two hours and a full day.  *Id.* at 4, 7.  Each detective would bring his case folders into Sergeant Everett's office and they would separately discuss each case assigned to that detective.  *Id.* at 4.  Sergeant Everett testified that he maintained a "mirror" file to the detective's files.  *Id.*  During the case reviews, Sergeant Everett discussed with the detective the current status of each case and Sergeant Everett's expectations going forward.  *Id.*  As part of the case reviews, Sergeant Everett also had access to the detectives' notes and case information that was stored electronically, including whatever recordings they had made in their cases.  *Id.* at 7, 9–10; Dkt. 39-9 at 26–28.

As for the failure of supervisors to spot-check the interior of detective vehicles, the Texas Ranger who investigated the Rojo case testified that the interior of Rojo's assigned police vehicle was "fairly typical" and "a normal typical car that somebody works out of most of the time." Dkt. No. 39-4 at 8.

As for Clark's conclusion regarding Rojo's "expectation of impunity," the only direct evidence in the record on what Rojo expected is his own admission that he knew his chain of command expected him to follow the policies and norms of the BSPD.  Anything else about what Rojo expected is circumstantial, at best, and conjecture unsupported by the record, at worst.

Even assuming there was enough circumstantial evidence to create a fact issue regarding whether Rojo expected that he could commit his crimes with impunity, such a finding would relate only to Rojo's frame of mind. One cannot bootstrap from that alone a fact issue regarding whether the BSPD had a persistent, widespread practice of not enforcing policies that could have prevented the harm to D.B.[18] What controls in the context of municipal liability under § 1983 are the expectations of the policymakers, not the expectations of the employees. And here there is no evidence that Chief Williams or any other BSPD policymaker expected Rojo or any other officer to flout formal policy.

The only examples of potential supervisory failures in the record are again those of Franco and, four years later, Rojo.[19] And the only similarity between the two in terms of policy violations is that Rojo, like Franco, failed to record his encounter with a juvenile female. And as of the time Rojo assaulted D.B., the record reflects that only Franco's misconduct was known to the BSPD.[20] And again this is after the parties have had ample opportunity to fully develop the record through discovery, and after the intense scrutiny of Rojo's criminal trial.

Both Rojo and Franco admitted that the City had policies in place that required the recording of interactions with the public. Dkt. No. 31-2 at 55–65, 83. And Rojo admitted in connection with his IA investigation that he was aware that:

- it was his responsibility to ensure that his contacts were recorded;

- it was his responsibility to ensure that dispatch was notified of his transport of a juvenile and to report his beginning and ending mileage, and that his failure to do so was a violation of the BSPD rules and inter-departmental norms;

---

[18] This is particularly true since there is little, if any, evidence that Rojo was thinking rationally or reasonably about his criminal conduct.
[19] As previously mentioned, Chief Williams testified to several instances of informal discipline for failing to activate the audio/video recording devices in police vehicles over his five years as chief, but these do not appear to be significant, nor is there any evidence that they constituted supervisory failures. *See supra* page 22.
[20] Plaintiff's assertion that "there were significant failures of the City to discipline detectives, including detective Rojo, for the period with Sgt. Everett in charge — more than a decade" is without support in the record. Dkt. No. 39 at 57.

- it was an unacceptable practice for him to transport a juvenile female to any location other than BSPD for questioning;

- taking a juvenile female to a secluded area for questioning brought reproach, discredit or embarrassment to himself, his supervisors, and to the BSPD;

- taking a juvenile female to an area other than BSPD for questioning  and without witnesses, without checking out with dispatch, reporting beginning and ending mileage to dispatch, and without recording both audio and video of the entire contact (1) brought reproach, discredit or embarrassment to the BSPD, (2) was subversive to the good order and discipline of the BSPD, and (3) constituted incompetent performance of duty; and,

- he did not follow established BSPD procedures when he transported a juvenile female to a location other than the BSPD.

Dkt. No. 31-2 at 55–65.

At no time, apparently not even during his criminal trial, did Rojo claim to have been unaware of BSPD policies that were potentially relevant to the assaults on D.B.  Or believe that such policies were not enforced.  *Id.*  Or believe that his compliance with those policies was not expected by his chain of command.  *Id.*  Nor did Rojo otherwise claim that his supervisors tacitly approved of his crimes or suggest that his supervisors created a culture within the BSPD of "looking the other way."[21]  *Id.*

To the extent that Plaintiff offers the Franco incident in support of her failure-to-supervise claims, that solitary, dissimilar, and less egregious incident four years prior and under a different police chief does not create a genuine issue of fact on that claim.  The Court accepts as true that, during the early morning hours of August 28, 2011, Officer Dustin Franco fell short of conducting himself in exemplary fashion.  At a minimum, he demonstrated a profound lapse of judgment.  He

---

[21] One of the first things Chief Williams, Lieutenant Gordon, and Lieutenant Patterson did after learning of the complaint against Rojo was to search his video and audio recording devices, which suggests at least some  expectation on their part that Rojo was recording as required and is inconsistent with the allegation that they created a culture in which recording was not expected or required. Dkt. No. 31-2 at 51.

acknowledged a failure to follow policy but, importantly within the context of a failure-to-supervise claim, he also acknowledged knowing that he should have followed policy.

Other policies Franco appears to have followed that early morning. For instance, he reported the juvenile transport to dispatch, along with his beginning and ending mileage, unlike Rojo. He also contacted his supervisor from the scene when he had difficulty contacting the mother. His supervisor that early morning would have known that Franco reported stopping a juvenile for a curfew violation and sought his guidance from the scene. The supervisor also would have known that a female officer was on the scene with Franco during much of the encounter. The supervisor would have also known that Franco was transporting a juvenile and that he called in his beginning and ending mileage. Finally, the supervisor would have known that, after transporting the juvenile to the house, Franco continued to respond to calls from dispatch. All of this is in the record. However, there is no explanation by Plaintiff for how Franco's supervisor should have been aware under these circumstances of what transpired after Franco left the juvenile at the house. Whatever failures occurred after that point in time were, again, failures of Franco's judgment, not of his supervision.

Other than Franco, however, there is no specific evidence prior to Rojo's crimes of BSPD officers lacking needed supervision or violating City policies that might have prevented the assaults on D.B., or violating any other policies.[22] Likewise, there is no specific evidence prior to Rojo's crimes against D.B. of a persistent, widespread practice within the BSPD of either officers not being properly supervised or of officers not following, or the BSPD not enforcing, policies that would have prevented the assaults on D.B.

---

[22] Again, other than the several non-specific instances of informal discipline for failing to activate the audio/video recording devices referenced by Chief Williams in his deposition testimony.

Moreover, as the City points out, the fact that the policy violations of Franco and Rojo —
the only specific examples of policy violators in the record — were swiftly investigated and
addressed once discovered effectively rebuts any such inferences and is itself compelling evidence
that the City does in fact expect and enforce compliance with its policies.

Viewed as of the time prior to Rojo's crimes being reported, the City appeared to have
appropriate policies and supervisory practices in place, including those to reduce the risk of harm
to persons such as D.B.   Again, this does not mean that these policies and practices could not have
been better.  Nor does it mean that no officer ever violated policy.  But it does mean that the BSPD
appeared to have a practice of largely enforcing its policies through supervision and, generally, its
officers appeared to follow policy.

The evidence is that both Franco and Rojo knew what the BSPD policies were and knew
that their chains of command expected them to follow them, including those governing interactions
with juveniles.  Their knowledge of these policies and their supervisors' expectations of
compliance is itself evidence that they were being appropriately supervised. There is no evidence
that either believed that their chain of command did not expect compliance with policy, even
though it may have been in their best interests, once accused, to claim tacit supervisor approval.

As with any organization, there will be exceptions when employees do not follow policy,
either inadvertently or in furtherance of their own objectives, sinister and otherwise.  And this can
be true even with the best of supervision.  Here, however, the only evidence of relevant exceptions
within the BSPD are Franco and Rojo.

In effect, Plaintiff asks this Court to look at the misconduct of these two officers, four years
apart and, notwithstanding the above, extrapolate from the fact that they may have violated some
of the same policies (but with drastically different outcomes) that they are somehow more than

exceptions and in fact represent a rule within the BSPD that following policy was not expected. And to further infer, below, that Chief Williams knew of this practice, knew it posed a substantial risk of harm to persons such as D.B., and looked the other way. On this record, the Court is unable to conclude that there is a genuine issue of material on these issues. Rather, Rojo's violations of BSPD policy appear to be the isolated crimes of a single officer.

### 3. Whether there was a persistent, widespread practice within BSPD of failing to implement more effective policies to detect and deter sexual assaults by officers?

Plaintiff also alleges that the City failed to implement more effective policies to detect and deter sexual assaults by officers and continued to adhere to flawed policies despite a warning that these policies were insufficient to prevent the type of harm suffered by D.B. Dkt. No. 39 at 12, 45; Dkt. No. 1-3 at 12. The referenced warning is the Franco incident. *Id*.

Plaintiff suggests several policies and precautions that the City could have adopted to provide additional supervision over Rojo and other BSPD officers, but did not.[23] However, the sufficiency of the City's policymaking process cannot be judged against the standard of whether better policies were theoretically possible. "In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." *Canton*, 489 U.S. at 392 (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985)). That there may have been ways to improve upon what the City was doing does not dispose of the liability question under § 1983 in Plaintiff's favor. *Id*. at 391. Nor does that the City may have been negligent in not reassessing its policies in the aftermath of the Franco incident.[24]

---

[23] Plaintiff's proposed policies suggest that supervisors should "spot check" officers in the field, examine dispatch call sheets to "monitor what officers" do outside of the station, monitor vehicle location through tracking devices, and spot-check interior of detective vehicles. Dkt. No. 39 at 25, 33, 43.
[24] These issues are not before the Court.

Here, other than the Franco incident, there is no evidence in the record that the City was on notice that its existing policies or policymaking practices were inadequate in terms of detecting and deterring sexual assault by officers.  And the fact that Franco failed to comply with certain policies on August 28, 2011, is not an indictment of either the policies he violated or the BSPD policymaking process.

Prior to Rojo's crimes, there were no previous incidents of sexual assault by officers and only one unsubstantiated incident — four years prior — involving Franco's alleged inappropriate communications with a juvenile female.  This evidence is insufficient to create a fact issue on whether the BSPD had a persistent, widespread practice of not implementing more effective policies to detect and deter sexual assaults by its officers.

## B.  Municipal Liability—Policymaker[25]

Under the second "policymaker with knowledge" prong, "[a]ctual or constructive knowledge of [the offending practice] must be attributable to the governing body of the municipality or to an official to whom that body has delegated policy-making authority." *Webster*, 735 F.2d at 841; *Hicks-Fields v. Harris Cnty., Tex.*, 860 F.3d 803, 808 (5th Cir. 2017); *Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010) (quoting *Praprotnik*, 485 U.S. at 125 (A municipal policymaker may be either a governing body or a municipal official with "the responsibility for making law or setting policy in any given area of a local government's business.")).  Plaintiff must prove that practices she claims harmed D.B. resulted "from the decision or acquiescence of the municipal officer or body with 'final policymaking authority' over the subject matter of the offending [practice]." *Gros v. City of Grand Prairie, Tex.*, 181 F.3d 613, 615 (5th Cir. 1999).

---

[25] The Court resolves the "policymaker" issue if for no other reason than it factors into the "moving force" analysis below.

### 1. Who is the relevant policymaker?

Whether a municipal official has been delegated final policymaking authority is a question of state law to be resolved by the court. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989); *see also Webster*, 735 U.S. at 842.[26]

A district court may not rely on a presumption that, absent contrary evidence, the locus of final policymaking authority will always be vested within a municipality's lawmaking body. *Gros*, 181 F.3d at 615. To the contrary, "the Supreme Court has evinced no preference for any single body as the source of municipal policymaking authority." *Id*. (citing *Pembaur*, 475 U.S. at 480; *Praprotnik*, 485 U.S. at 124–25 (remarking that "one may expect to find a rich variety of ways in which the power of [local] government is distributed among a host of different officials and official bodies.")).

"Courts have consistently found that chiefs of police are official law enforcement policymakers for the purposes of municipal liability under § 1983." *Kincheloe v. Caudle*, No. A-09-CA-010 LY, 2009 WL 3381047, at *18 (W.D. Tex. Oct. 16, 2009) (citing *Fraire v. City of Arlington*, 957 F.2d 1268, 1279, n. 45 (5th Cir. 1992) (finding the Chief of Police to be the primary policymaker for the Arlington Police Department)). This determination, though, necessarily requires the Court to examine local and state positive law.

The City argues that the Big Spring Charter provides the City Council with authority to "make and enforce local police . . . regulations" and claims that the authority vested in the police chief to make policy is constrained by the City Council's "review and possible reversal" of any

---

[26] The Fifth Circuit noted in *Webster* that "allowing the jury to speculate" on the identity of municipal policymakers "hazards a violation of the prohibition against fixing municipal liability on the basis of respondeat superior."

decision.  Dkt. No. 42 at 11–12; Big Spring Charter art. III, § 1. [27]  Stated another way, the City's assertion rests on the premise that Chief Williams serves as a decisionmaker for the City, but not as an official policymaker.

There is a fine distinction between a policymaker and a decisionmaker.  *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 167 (5th Cir. 2010) (internal quotation marks and citation omitted). *See also Jett v. Dallas Indep. Sch. Dist*, 7 F.3d 1241, 1246 (5th Cir. 1993) ("In *Pembaur* and *Praprotnik*, the court carefully distinguished between those having mere *decisionmaking* authority and those having *policymaking* authority.") (emphasis in original).  The Fifth Circuit has recognized that a municipal governing body may delegate policymaking authority to a municipal official expressly or implicitly.  *Bennett*, 728 F.2d at 769.

Express delegations may include an express statement, as well as a job description or other formal action, while implicit delegations may, through conduct or practice, take the form of a municipal governing body implicitly encouraging or acknowledging a municipal official as a policymaker.  *Id*.; *Swann v. City of Dallas*, 922 F. Supp. 1184, 1204 (N.D. Tex. 1996), *aff'd*, 131 F.3d 140 (5th Cir. 1997) (per curiam).

In her response to the City's motion, Plaintiff contends that Chief Williams is a policymaker on behalf of the City because he holds "plenary policymaking power" and "signs policy manuals" issued by the BSPD.  Dkt. No. 39 at 35.  Supporting this contention, Plaintiff points to BSPD Policy 1.1, which defines policy as "a statement of the department's philosophy on a given issue" that consists of "principles and values which guide the performance of department employees." Dkt. No. 39-2 at 2.  The text of BSPD Policy 1.1 states that "[o]nly the

---

[27] The City has asked the Court to take judicial notice of the contents of its charter and the Court has determined that it may do so as the charter is a publicly available document.  *See Roan Bros. Tile Co. v. City of Garland*, No. 3:04-CV-1090-B, 2006 WL 8437017, at *15, n. 6 (N.D. Tex. Jan. 12, 2006); *Carmona v. City of Dallas*, No. 3:19-CV-469-L, 2019 WL 5191253, at *4 (N.D. Tex. Oct. 11, 2019).

Chief of Police determines policy," which, Plaintiff argues, establishes Chief Williams as a municipal policymaker on behalf of the City.  *Id.*

The City argues that the City of Big Spring's Charter vests final policymaking power in the City Council—not Chief Williams—and that "any authority Chief Williams has to set policy is subject to review and possible reversal by the City Council."  Dkt. No 42 at 11–12. The City admits that Chief Williams holds certain limited powers, *e.g.*, the power to execute search warrants, quell riots, disorders, and disturbances of the peace, but it argues these limited powers do not include the ability to enact and create policy on behalf of the municipality.  *Id.* at 11.

Ultimately, the Court finds the City's argument on this issue unconvincing.  The operative facts at play here are distinguishable from the City's reliance on facts in *Reed v. City of Garland*, Tex., No. 3:04-CV-2139-K, 2007 WL 2948368 (N.D. Tex. Oct. 9, 2007) and *Brown*, 337 F.3d 539.

In *Reed*, the city charter undisputedly stated that any policy or decision by the police chief was subject to the direct approval and supervision of the city manager.  2007 WL 2948368, at *2. Likewise, the Fifth Circuit in *Brown* concluded that the Houston mayor did not have final policymaking authority to terminate a city employee because the relevant city ordinances explicitly delegated the authority to terminate a city employee to the Houston Civil Service Commission. 337 F.3d at 541.

Similarly, when considering language in the Dallas City Charter, courts have found the Dallas chief of police does not act as the final policymaker because he "does not act in lieu of the governing body" and "is at all times subject to the rules and supervision of the City Manager." *Pinedo v. City of Dallas, Tex.*, No. 3:14-CV-0958-D, 2015 WL 221085, at *5 (N.D. Tex. Jan. 15, 2015) (citing *Mosser v. Haney*, No. Civ. A. 3:03-CV-2260-B, 2005 WL 1421440, at *4 (N.D. Tex.

June 17, 2005)); *Guzman v. City of Dallas*, No. 3:09-CV-2426-B-BD, 2010 WL 4514369, at *3 (N.D. Tex. Aug. 31, 2010), *rec. adopted*, 2010 WL 4514364 (N.D. Tex. Nov. 9, 2010).

In contrast, the Big Spring City Charter contains no such designation that clearly vests in the City Council, City Manager, or other municipal official the type of supervisory oversight or approval authority that would *ipso facto* divest any potential final policymaking authority from Chief Williams with respect to BSPD policies.

The Big Spring City Charter is silent as to whether the police chief must seek approval from the City Council before enacting police policies within the BSPD.[28]  The City suggests, and Chief Williams acknowledges in his deposition testimony, that the City Council had the right to review or reverse BSPD policies, but the Charter does not specify to what degree policies adopted and promulgated by the police chief could be reviewed and reversed by the City Council other than stating that the City Manager shall "exercise control over all departments and officers created by the council."  Dkt. No. 42 at 11–12; Charter, Art. IV, § 14.  The mere existence of administrative oversight of Chief Williams's decisions, however, is not enough; the administrative oversight must be precise and pertain to the area of authority in question.  *Zarnow*, 614 F.3d at 168 (citing *Beattie v. Madison Cnty. Sch. Dist.,* 254 F.3d 595, 603 (5th Cir. 2001)).

Here, it would be difficult not to conclude that Chief Williams acted "in lieu" of the City Council because the police policies he promulgated were final policies until reviewed, altered, changed, or amended by the City Council, and until such review occurred, the promulgated and adopted policies retained the force of law within the BSPD.  Moreover, there's no evidence in the record that the BSPD policies adopted by Chief Williams were ever reviewed, reversed, altered, changed, or amended by the City Council.  It seems clear that while the City Charter may not

---

[28] Article VI, § 4.

delegate the police chief express policymaking authority, he at the very least retains implicit authority to set police policies as Chief of Police.

Therefore, the Court concludes that Chief Williams is a final policymaker on behalf of the City with respect to police policies and for § 1983 purposes. However, because Plaintiff alleges that the constitutional violations stemmed from persistent widespread practices, she also must show that Chief Williams, as final policymaker, had actual or constructive knowledge of such practices. *Cox v. City of Dallas, Tex.*, 430 F.3d 734, 748–49 (5th Cir. 2005).

### 2.  Whether Chief Chad Williams had actual or constructive knowledge of persistent, widespread practices within the BSPD of (1) not enforcing through supervision and discipline policies that would have prevented the assaults on D.B., or (2) failing to implement more effective policies to detect and deter sexual assault by officers?

Plaintiff alleges that Chief Williams knew or should have known of the alleged practice within the BSPD of not enforcing policies through supervision and discipline.  She alleges that the City was deliberately indifferent in its failure to supervise, discipline, and monitor Rojo and that the alleged failures "had to be clear . . . [to Rojo's] direct supervisors, the Chief, and anyone else who made any effort to consider how to fulfill the need for protection." Dkt. No. 1-3 at 6.  She also alleges that "[w]hatever [Rojo's] supervisors, and anyone else in the City knew about [Rojo's sexual abuse of other females] before the attacks on D.B. . . . they disregarded."  *Id.* at 10.  She alleges that the constitutionally deficient customs and practices[29] "persisted, systematically, routinely, and visibly . . . " (*Id.* at 11) and "were readily apparent to officers . . . and were particularly apparent to supervisors, including the Police Chief, and to any other policymaker who

---

[29] As alleged by Plaintiff:  Allowing police officers, even in controlled, non-emergency situations: (1) to be alone and unobserved with persons of the opposite sex in custody (including men alone with minor females); (2) to question persons of the opposite sex in custody (including minor females) in an office unobserved and with no other person; (3) to take custody of persons of the opposite sex (including minor females) in a police station, and to separate such minors from their parents, guardians, and other responsible adults so that they are alone and unobserved; and (4) to transport persons in custody (including minor females) to and from the police station, alone and unobserved in police vehicles, even when a child has a parent, guardian, or other responsible adult available to bring the child to and from the station.

looked." *Id.* at 13.  Finally, Plaintiff alleges that "[e]ven if no one had actual knowledge of the full scope of Defendant Rojo's misconduct, his actions and inactions provided more than sufficient evidence of a need for inquiry . . . ." *Id.*

The City contends that "Plaintiff has presented no evidence showing the City or any person delegated with policymaking authority knew of Rojo's misconduct until *after* it occurred."  Dkt. No. 42 at 14 (emphasis in original).  While this appears undisputed, the correct inquiry is whether the City, through Chief Williams, had actual or constructive knowledge of the allegedly constitutionally deficient practices of supervision, discipline, or policymaking.

"Actual or constructive knowledge of [a] custom must be attributable to the governing body of the municipality or to an official to whom that body has delegated policy-making authority."  *Webster,* 735 F.2d at 842.  The Fifth Circuit stated that actual knowledge may be shown by such means as discussions at council meetings or receipt of written information. *Bennett*, 728 F.2d at 768.  Constructive knowledge may be attributed to the governing body on the grounds that it would have known of the violations if it had properly exercised its responsibilities, as, for example, where the violations were so persistent and widespread that they were the subject of prolonged public discussion or of a high degree of publicity.  *Hicks-Fields*, 860 F.3d at 808 (citing *Bennett*, 728 F.2d at 768).

Plaintiff, citing deposition testimony from Chief Williams, Lieutenant Gordon, and Sergeant Everett, alleges that "in this small department, with senior officers serving together for more than a decade, the policies and customs of supervision, and the lack of supervision, were well known to all."  Dkt. No. 39 at 34–35.  In effect, Plaintiff appears to be arguing that Chief Williams and others in Rojo's chain of command had at least constructive knowledge of a pervasive, widespread practice of not supervising or not enforcing policies.  However, her argument that

officers within the BSPD were unsupervised and that this fact was "well known to all" is conjecture unsupported by the record cited by Plaintiff for this proposition, or any other specific fact in the record.

There is no evidence that Chief Williams or anyone in Rojo's chain of command had either actual knowledge or otherwise should have known of a pervasive, widespread practice of not enforcing policies — let alone policies that would have prevented sexual assault — and either looked the other way or otherwise routinely tolerated violations of policy. And the Court is not willing to infer solely from the fact that Chief Williams, Lieutenant Gordon, and Sergeant Everett worked together for years, and may have been friends, that they also conspired to not supervise officers or not enforce policy, particularly policies that would prevent the sexual assault of juveniles.

As stated above, the City had policies in place that governed officer conduct, including conduct with juveniles. And again, even Rojo and Franco knew these policies existed and, importantly, knew that their chains of command expected them to comply. Moreover, Chief Williams testified to several incidents of informal discipline — including Franco — for violations of these policies. As previously stated, the Court is not in a position to second-guess Chief Smith's decision that Franco's violations of policy warranted only informal discipline. Regardless, it appears that there were consequences to Franco for failing to comply with the BSPD policies and little, if any, evidence from which the Court can infer that the rank and file believed their chain of command would just look the other way if they violated policy.

More specifically as to constructive knowledge, Plaintiff alleges that even if no one within the BSPD chain of command had actual knowledge of the full scope of Rojo's crimes, his actions and inactions provided more than sufficient evidence of a need to inquire. However, there is no

specific evidence in the record that Rojo's chain of command had any inkling that Rojo was committing crimes or even that his behavior required closer scrutiny.

Likewise, there is no evidence that the alleged widespread practices of not supervising officers or not enforcing policies that would prevent sexual assault were the subject of any discussion — prolonged or otherwise — or any publicity, or anything else that would justify imputing constructive knowledge of these alleged practices to Chief Williams.

Nor is there any evidence that Chief Williams had actual or constructive knowledge of a failed policymaking process, or that more effective policies to detect and deter in-custody sexual assaults by officers were needed.  As stated above, other than the Franco incident four years prior, there is nothing in the record that would have put Chief Williams on notice that his existing policies were deficient or ineffective in preventing sexual assault by officers.  And there is no evidence that Chief Williams was on notice that existing BSPD policies created a substantial risk of sexual assault or other serious harm.  And to the extent Franco's failures of August 28, 2011, were similar to Rojo's crimes, they were again failures of Franco's judgment, not failures of BSPD policy or supervision.

Accordingly, the Court concludes that there is no genuine issue of material fact on whether Chief Williams had actual or constructive notice of a persistent, widespread practice within the BSPD of either (1) not enforcing policies through supervision and discipline that would have prevented the assaults on D.B., or (2) not implementing more effective policies to detect and deter in-custody sexual assaults by officers.

## C.  Municipal Liability—Moving Force

Even if the Court assumes that there is a fact issue as to each of the foregoing elements for municipal liability under § 1983, Plaintiff "must show either that (1) the policy *itself* violated

federal law or authorized or directed the [violation], or, if an informal policy or practice is alleged, that (2) the [practice] was adopted or maintained with deliberate indifference as to the known or obvious consequence that it would result in the violation of someone's federal rights." *Malone v. City of Fort Worth, Tex.*, 297 F. Supp. 3d 645, 655 (N.D. Tex. March 2, 2018) (citing *Johnson v. Deep E. Tex. Reg'l. Narcotics Trafficking Task Force, et al.*, 379 F.3d 293, 309 (5th Cir. 2004)). There is no allegation of the former, so the Court turns to the question of deliberate indifference.

Deliberate indifference is a high standard — "[a] showing of simple or even heightened negligence will not suffice." *Brown*, 520 U.S. at 407. Nor will even gross negligence. *Estate of Davis*, 406 F.3d at 381. It is a stringent standard of fault, requiring proof that the City's policymaker, Chief Williams, was aware of facts from which an inference could be drawn that a substantial risk of sexual assault or other serious harm existed because of the manner in which officers were supervised or disciplined, that he actually drew that inference, and that he did nothing to stop it. *Id.* at 383; *Brown*, 520 U.S. at 404; *Connick*, 563 U.S. at 61. Any such failure by Chief Williams to adopt a precaution to prevent sexual assaults by officers can support § 1983 liability, but only if it was an intentional choice, not merely an unintentionally negligent oversight. *Canton*, 489 U.S. at 390–391. A mere "but for" coupling between cause and effect is insufficient to establish this connection. *Fraire*, 957 F.2d at 1281.

Deliberate indifference may be inferred from either (1) a *pattern* of *similar* constitutional violations or, absent a pattern, from (2) a plaintiff "showing a single incident with proof of the possibility of recurring situations that present an obvious potential for violation of constitutional rights." *Garza v. City of Donna*, 922 F.3d 626, 637–38 (5th Cir. 2019) (citing *Littell v. Houston Indep. Sch. Dist.*, 894 F.3d 616, 624 (5th Cir. 2019) (quoting *Burge*, 336 F.3d at 373 (emphasis

added))).  Plaintiff appears to argue both bases for inferring deliberate indifference, so the Court addresses both below.

### 1.  A pattern of similar constitutional violations

To support an inference of deliberate indifference using a pattern of similar violations, the prior violations "must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectional conduct is the *expected, accepted practice* of city employees."  *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 850 (5th Cir. 2009) (quoting *Webster*, 735 F.2d at 842) (internal quotation marks omitted) (emphasis added).  As stated above, "[a] pattern requires *similarity and specificity*; '[p]rior indications cannot simply be for any and all "bad" or unwise acts, but rather must point to the *specific violation* in question.'"  *Peterson*, 588 F.3d at 851 (quoting *Estate of Davis*, 406 F.3d at 383) (emphasis added).

In *Brown*, Justice O'Connor discussed the reasons for imposing § 1983 liability based on a pattern of incidents and recalled that the Supreme Court in *Canton* spoke in terms of a deficient "program," necessarily intended to apply over time to multiple employees.  520 U.S. at 407 (citing *Canton*,  489 U.S. at 390).  As she explained, it is the existence of such a "program" that:

> makes proof of fault and causation at least possible in an inadequate training case. If a program does not prevent constitutional violations, municipal decisionmakers may *eventually* be put on notice that a new program is called for. Their *continued adherence to an approach* that they know or should know *has failed to prevent tortious conduct* by employees may establish the conscious disregard for the consequences of their action—the "deliberate indifference"— necessary to trigger municipal liability. [*Canton*], at 390, n. 10, 109 S. Ct., at 1205, n. 10. ("It could ... be that the police, in exercising their discretion, *so often violate constitutional rights* that the need for further training must have been *plainly obvious* to the city policymakers, who, nevertheless, are 'deliberately indifferent' to the need"); *id.*, at 397 [internal citations omitted]. ("[M]unicipal liability for failure to train may be proper where it can be shown that policymakers were *aware of, and acquiesced in*, a pattern of constitutional violations ..."). In addition, the existence of a pattern of tortious conduct by inadequately trained employees may tend to show that the lack of proper

training, rather than a one-time negligent administration of the program or *factors peculiar to the officer involved* in a particular incident, is the "moving force" behind the plaintiff's injury. See *id.*, at 390–391, 109 S. Ct., at 1205–1206.

*Brown*, 520 U.S. at 407–408 (emphasis added).  Although this is not a failure-to-train or failure-to-screen case like *Brown* and *Canton*, respectively, the rationale and principles set out in those cases are instructive here.

Plaintiff alleges that "[b]ased on the evidence of so many similar, grievous assaults of minors . . . over a long period of time . . . this City was deliberately indifferent in its failure to [supervise, discipline, and monitor] officers . . . to deter sexual predators" like Rojo.  Dkt. No. 1-3 at 6.  Applying *Brown*, it is clear that liability based on a pattern of similar violations can attach here only if the City had notice that its existing manner of supervising or disciplining police officers was not preventing sexual assaults or other similar grievous harm, yet it continued to adhere to that approach, effectively acquiescing in those violations.

The only sexual assaults in the record are those perpetrated by Rojo and, to the extent those assaults constituted a pattern, they occurred before Chief Williams or anyone within the BSPD had notice of his crimes.  *Id.* at 9–10.  At the time D.B. was assaulted by Rojo, Chief Williams was not on notice of any substantiated allegations of sexual misconduct or serious policy violations of any kind.

There was no continued adherence by Chief Williams to supervisory or policymaking practices that he either knew or should have known posed a substantial risk that officers would commit sexual assault, or had previously failed to prevent sexual assaults.  The only incident in the record that is even remotely similar is the Franco incident four years earlier but, for the reasons previously explained, that incident fails to pass the "similarity and specificity" test of *Peterson* and *Davis*.  And that single, unsubstantiated allegation is neither the kind nor the number of violations

from which the Court can reasonably infer that Chief Williams or the City should have been on notice that it's approach to supervising or disciplining police officers was failing.[30]

Here, there is nothing in the record to support an inference that the alleged failures to supervise or discipline Rojo, if any, were "plainly obvious" to Chief Williams. There is no evidence that Chief Williams had notice or knowledge, constructive or otherwise, that the BSPD manner of enforcing policy or supervising and disciplining officers posed a substantial risk of sexual assault or other grievous harm. Indeed, the absence of sexual assaults by officers prior to Rojo likely caused Chief Williams to reasonably believe that the BSPD's manner of supervising and disciplining officers was appropriate. That it never occurred to Chief Williams or others in Rojo's chain of command that Rojo would sexually assault juveniles under the guise of investigating crime might constitute negligence but does not amount to deliberate indifference.

Nor is there evidence that the BSPD manner of policymaking posed a substantial risk that officers would commit sexual assault or other grievous harm. Or that Chief Williams or the City were aware of, and acquiesced in, a pattern of either not enforcing policies that would have prevented sexual assaults by officers or not implementing more effective policies to detect and deter sexual assault by officers.

It is this conscious disregard by Chief Williams or the City for the consequences of their actions that constitutes deliberate indifference, and that is missing on this record.

As Justice O'Connor explained, the law demands a *pattern* of violations to ensure that the moving force for the harm was neither the isolated negligent administration of a program nor *factors peculiar to the officer involved*. 520 U.S. at 408. On the record here, the moving force for

---

[30] This does not mean that one sexual assault by an officer would not be sufficient to trigger municipal liability for any subsequent sexual assaults. But on this record, there was no sexual assault by an officer prior to Rojo.

the sexual assaults of D.B. appears to have been a set of factors peculiar to Rojo.  At least in terms of his depravity and willingness to violate the law, Rojo appears to be an isolated example of one. To the extent that there may have been *negligent* administration of officer supervision or policymaking within the BSPD, there is no municipal liability under § 1983.

Plaintiff alleges that the City's failures "readily enable" officers like Rojo to "frequently disregard potentially protective practices."   Dkt. No. 1-3 at 12.  She alleges that the City's "unconstitutional policies and customs concerning . . . supervision, monitoring, [and] discipline" were the "moving force that *allowed*" Rojo to violate D.B.'s constitutional rights (*Id.* at 5) (emphasis added) and that officers who were "*so inclined . . .  can engage* in unobserved sexual (and other) abuse." *Id.*  at 11 (emphasis added).  Finally, in an apparent reference to Rojo's abuses, Plaintiff argues that "[t]he numbers of such abuses . . . is evidence . . . that the lack of proper policies and customs . . . *can* contribute to cause sexual abuse such as was suffered by D.B. . . ." *Id*. at 12 (emphasis added).

Even assuming the City's practices "allowed," "enabled," or "contributed" to Rojo's misconduct, these may be sufficient in a negligence case, but fall short of constituting "moving force" under § 1983.  As stated above, a mere "but for" coupling between cause and effect is insufficient to establish moving force.  *Fraire*, 957 F.2d at 1281.

And while Plaintiff alleges that "proper policies, customs and oversight . . . *would not have allowed* [Rojo] to be alone with females (particularly minor females) . . . ." (Dkt. No. 1-3 at 13–14) (emphasis added), there is no credible evidence before the Court regarding how or why the policies, customs, and oversight Plaintiff proposes would not also fail when met with Rojo's demonstrated willingness to sexually assault juveniles despite the existence of policies, practices, and even criminal laws forbidding the same.

In further support of her "moving force" argument, Plaintiff alleges that "[a]pparently" Rojo "believed that he could get away with these obvious crimes" because of a lack of policies, customs and oversight caused by the City's failures.  Dkt.  No. 1-3 at 10, 13 (emphasis added). But, as noted above, the only evidence in the record regarding what Rojo believed is his admission that he knew his chain of command expected him to follow the relevant policies. Dkt. No. 31-2 at 62–63.  And, again, this case cannot turn on what Rojo subjectively believed unless there is credible evidence that his belief was fostered by the deliberate indifference of Chief Williams, and there is no such evidence here.

Plaintiff also alleges that "[w]hatever his supervisors . . . knew about this abuse . . . they disregarded."  Dkt. No. 1-3 at 10.  But there is no evidence in the record that Chief Williams or others in Rojo's chain of command knew anything about Rojo's crimes, or about a substantial risk of sexual assault, prior to the time the BSPD suspended Rojo and initiated an investigation.  *Id.* And except for the Franco incident four years prior, there is no evidence regarding any previous inappropriate incident involving a BSPD officer.

The touchstone of deliberate indifference is notice, and that notice must be notice of *similar* violations. *Estate of Davis*, 406 F.3d at 383.  The prior violations must be "fairly similar to what ultimately transpired." *Id.*  Here, again, even assuming the juvenile's claims against Franco were true, what ultimately transpired in that case cannot be described as similar to what ultimately transpired in D.B.'s case.

In short, none of the reasons announced by the Supreme Court for imposing liability based on a pattern of incidents is present in this case.

## 2. The single incident exception

Any argument Plaintiff makes under the single-incident exception likewise fails. This encompasses what the Plaintiff refers to as her "Obvious Potential for Violation" claim. Dkt. No. 39 at 47. Plaintiff argues that the "totality of the City's supervisory failures . . . created such an 'obvious potential for violation' as to violate Constitutional minimum duties." *Id.*

The single-incident exception "is possible only in very narrow circumstance" because the Fifth Circuit has "generally reserved the single-incident method . . . for cases in which the policymaker provides no training [or supervision] whatsoever with respect to the relevant constitutional duty, as opposed to training [or supervision] that is inadequate only as to the particular conduct that gave rise to the plaintiff's injury." *Littell*, 894 F.3d at 625, n.5 (quotations and citations omitted).

Plaintiff "seem[s] to assert that this single incident of the City's alleged failure to [discipline Franco or supervise Rojo] . . . is sufficient to infer a policy or custom of such conduct." *Edwards v. Oliver*, No. 3:17-CV-01208-M-BT, 2019 WL 4603794, at *13 (N.D. Tex. Aug. 12, 2019) (quoting *Ling v. City of Garland*, No. 3:05-CV-1754-P, 2007 WL 9712236, at *5 (N.D. Tex. Feb. 23, 2007)).

In explaining the rationale for the Supreme Court leaving open the possibility of municipal liability in the absence of a pattern of constitutional violations, Justice O'Connor explained that the Supreme Court

> simply hypothesized that, in a narrow range of circumstances, a violation of federal rights may be a *highly predictable consequence* of a failure to equip law enforcement officers with specific tools to handle recurring situations. The *likelihood that the situation will recur* and *the predictability* that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that a policymaker's decision not to train the officer reflected "deliberate indifference" to the [constitutional violation]. The high degree of predictability may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable.

*Brown*, 520 U.S. at 409 (emphasis added).

In *Grandstaff v. City of Borger*, 767 F.2d 161, 171–72 (5th Cir. 1985), the Fifth Circuit applied the single-incident exception when it "permitted a jury to find municipal policy after hearing evidence describing a single day of egregious events and the subsequent failure to discipline those officers involved." *Tarver v. City of Edna*, No. V-03-39, 2006 WL 3053409, at *8 (S.D. Tex. Oct. 26, 2006). The Fifth Circuit summarized the relevant facts in *Grandstaff* as follows:

> [I]n response to a minor traffic violation, three patrol cars engaged in a high speed chase during which they fired wildly at the suspected misdemeanant; the object of this chase took refuge on an innocent person's ranch, where the entire night shift of the city police force converged and proceeded to direct hails of gunfire at anything that moved; although nobody except the police was ever shown to have fired a shot, the innocent rancher was killed when the police shot him in the back as he was emerging from his own vehicle; after this "incompetent and catastrophic performance," . . . which involved a whole series of abusive acts, the officers' supervisors "denied their failures and concerned themselves only with unworthy, if not despicable, means to avoid legal liability."

*Coon v. Ledbetter*, 780 F.2d 1158, 1161 (5th Cir. 1986) (quoting *Grandstaff*, 767 F.2d at 166, 171).

In affirming the jury verdict for the plaintiff in *Grandstaff*, the Fifth Circuit reasoned that "[w]here the city policymaker knows or should know that the city's police officers are likely to shoot to kill without justification and without restraint, so as to endanger innocent third parties, the city should be liable when the inevitable occurs and the officers do so." 767 F.2d at 170. "Where police officers know at the time they act that their use of deadly force in conscious disregard of the rights and safety of innocent third parties will meet with the approval of city policymakers, the affirmative link/moving force requirement is satisfied." *Id*. Subsequent cases decided by the Fifth Circuit emphasize that the rationale presented in *Grandstaff* may only be applied to cases with "equally extreme factual situations." *Coon*, 780 F.2d at 1161–62; *see also*

*Traver*, 2006 WL 3053409, at *8 (citing multiple cases holding the same); *Edwards*, 2019 WL 4603794, *13 (same).

In finding a police policy or custom of disregard for human life and safety in *Grandstaff*, the Fifth Circuit relied on the "repeated acts of abuse . . . by several officers in several episodes[.]" 767 F.2d at 171.  The Fifth Circuit also inferred from the police chief's failure to issue reprimands, discharge any officer, or otherwise acknowledge any wrongdoing by any of the six officers involved in the "wild barrage" that night, that the chief was deliberately indifferent to human life and safety and that the dangerous recklessness of the officers that night was approved by the chief.

Again, absent extreme facts comparable to *Grandstaff*, "the Fifth Circuit does not permit an inference of an unconstitutional custom or policy from a municipality's failure to discipline an officer for a single incident." *Tarver*, 2006 WL 3053409, at *8 (citing *Fraire*, 957 F.2d at 1278–79).  "It is not enough that the city could, but does not, reduce the risk of harm to the plaintiff." *Grandstaff*, 767 F.2d at 169 (internal citations omitted).  "Nor does it satisfy the causal link/moving force requirement to prove that a supervisor has failed to satisfy a general responsibility to supervise employees imposed by state law."  *Id.*

The City argues that "unlike the predictable nature of failing to train an officer on how to approach a given situation, it is virtually impossible to predict the consequence of a failure to supervise an officer at any given point in time."  Dkt. No. 42 at 19.  The Court agrees.

In contrast to the chief of police in *Grandstaff*, Chief Williams was confronted with a single detective who surreptitiously committed crimes.  Immediately upon learning of Rojo's crimes, Chief Williams suspended him, referred the matter for a criminal investigation, opened an IA investigation, and, ultimately, terminated him.  These facts could not be more different than the facts in *Grandstaff*.

As discussed above, while an officer's misuse of deadly force may be the highly predictable consequence of a constitutionally deficient training program related to officer use of such force, on these facts, the Court is unable to conclude that the sexual assault of D.B. and others by Rojo, in direct contravention of criminal laws, existing policies, his own understanding of what his chain of command expected, and the most basic tenets of human decency, was the highly predictable consequence of either the manner in which the BSPD supervised him or the absence of additional policies.

There is also no evidence to suggest that misconduct of the character perpetrated by Rojo is likely to recur. In fact, the evidence suggests that this is the first time something like this has ever occurred within the BSPD.[31]

Nor is it predictable that another officer will commit crimes of the type committed by Rojo. Rojo's crimes and the proclivities that motivated them transcend the realm of policy and far exceed what the closest supervision and the best of policies, even those advocated by Plaintiff, are capable of regulating. As Lieutenant Gordon testified, "what Rojo did was do everything he could to go undetected," so whatever policy the BSPD could have implemented, Rojo would have circumvented. Dkt. No. 39-8 at 5. Short of having a supervisor keeping an officer in his line of sight at all times, there are no policies or procedures in the context of police detective work that will prevent a detective possessed of criminal intent from victimizing citizens if he is so inclined. The reality is that the types of crimes perpetrated by Rojo are not the types of crimes that would not occur but for more supervision or more, or even better, policies.

---

[31] Franco's alleged conduct, particularly as unsubstantiated, is qualitatively different than Rojo's conduct, the latter involving the sexual assault of multiple juveniles on multiple occasions, and for which Rojo was criminally convicted.

There is also no evidence that Rojo was motivated to assault D.B. based on the manner in which the BSPD supervised him, other than him having the same latitude and discretion that one would reasonably expect with any experienced police detective.

Nor is there any evidence that Rojo was motivated to assault D.B. based on the BSPD's failure to implement more or different policies, assuming that whatever policies were hypothetically implemented would also necessarily retain the latitude inherent in and essential to the performance of the job of police detective.

Nor is there evidence that Rojo was motivated to assault D.B. based on a belief that his chain of command would "look the other way," or based on any assumption by Rojo that he would not be held accountable if caught.

To the contrary, the evidence shows that: (1) there were policies/procedures and criminal laws in place to prevent his misconduct, (2) Rojo knew of those policies/procedures and criminal laws, (3) Rojo knew his chain of command expected him to follow those policies/procedures and laws, and (4) Rojo violated the policies and laws notwithstanding his knowledge that compliance was expected of him.

Police detectives are expected and required to work independently, and no policy will prevent the criminal acts of a rogue officer.  But there should be no municipal liability under § 1983 when the offending officer's shortcomings resulted from factors other than a faulty program of the city.  *Canton*, 489 U.S. at 390–91.

Nor will liability attach if an otherwise sound program is occasionally administered negligently.  *Id.* at 391.  While reasonable minds may disagree on whether there may have been negligence in connection with how closely the supervisors were supervising or monitoring compliance with policies within the BSPD, that issue is not before the Court.  And to hold the City

liable here "would march municipal liability too far down a path toward liability based on simple negligence.  In so doing, we would fatally undermine *Monell*'s rejection of respondeat superior liability." *Stokes*, 844. F.2d at 274–75.

## VII.  CONCLUSION

For these reasons, the City's Motion for Summary Judgment (Dkt. No. 29) is GRANTED and Plaintiff's claims under 42 U.S.C. § 1983 against the City are DISMISSED with prejudice. The case will proceed on Plaintiff's claims against Rojo in his individual capacity.

The Court directs the parties to complete all remaining discovery, if any, within sixty (60) days from the date of this order.

Furthermore, there is no just reason for delay in entering a final judgment and final judgment should be entered as to the claims dismissed above pursuant to Federal Rule of Civil Procedure 54(b).

Judgment shall be entered accordingly.

IT IS SO ORDERED this 19th day of May, 2020.

_____

JOHN R. PARKER
UNITED STATES MAGISTRATE JUDGE